John Daniel SKIMMERHORN,
Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Mark Dewayne Skimmerhorn,
Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 1997–CA–000532–MR,
1997–CA–000537–MR.

Court of Appeals of Kentucky.

Oct. 9, 1998.

As Modified on Denial of Rehearing
Dec. 4, 1998.

Discretionary Review Denied
by Supreme Court Sept. 15, 1999.

Susan J. Balliet, Frankfort, for Appellants.

A.B. Chandler, III, Attorney General, William L. Daniel, II, Assistant Attorney General, Frankfort, for Appellee.

Before: GUIDUGLI, JOHNSON and KNOPF, JJ.

## OPINION

JOHNSON, Judge:

John Daniel Skimmerhorn (John) and Mark Dewayne Skimmerhorn (Mark), brothers, each appeal from final judgments of conviction of the Daviess Circuit Court entered on February 18, 1997, which convicted each man of burglary in the second degree in violation of Kentucky Revised Statutes (KRS) 511.030.[1] John was also convicted of the status offense of persistent felony offender in the second degree and Mark was convicted of being a persistent felon in the first degree, both offenses in violation of KRS 532.080. John was sentenced to a ten-year term of imprisonment while Mark was sentenced to a fifteen-year term of imprisonment. On appeal, both men argue that the trial court erred in not directing a verdict in their favor and Mark argues that the trial court erred in allowing the use of certified copies of out-of-county convictions for purposes of proving persistent felon status without the presence of the custodian of records and without verification that he was the same person referred to in the Hopkins Circuit Court judgment of conviction. We affirm.

On December 6, 1993, Charles Russell (Russell) contacted Detective Susan DeWitt (Detective DeWitt) to report that a safe which he kept in his bedroom was missing and had apparently been taken the previous night while he and his wife had visited a friend for dinner. Russell claimed that the safe contained jewelry, $14,000 in cash[2] and various documents.

That evening, Russell's stepson, Chuck Manaway (Manaway), contacted Detective DeWitt to tell her that he could find out who committed the burglary. The next day Manaway called Detective DeWitt to tell her that Jason Key (Key), John and Mark's sixteen-year-old nephew, wanted to meet with her. Key went to Detective DeWitt's office that day and gave a written statement admitting his own involvement in the burglary and implicating John and Mark and their respective wives, Dottie and Shari.

When Key testified at the trial, he recanted his written statement. However, Key was asked about the written statement in which he had stated: He had gone to John's house, they had talked about safes, he had mentioned that Manaway's parents had a safe and he knew where Manaway lived. He and the four Skimmerhorns drove to Russell's house in John's car and pulled in the driveway. Dottie turned the car around and John and Mark took the safe from the house and placed it in the trunk. They drove to John's house, unloaded the safe and Key then left. Key returned later to find out what had been found in the safe. John showed him a ring and told him that the ring was the only thing in the safe. They loaded the safe into Mark's car and took it to Mark's house. Key then bought John's car, an old Pontiac Bonneville, for $200, and the four Skimmerhorns left for Atlanta that night.

The next day, December 8, Detective DeWitt obtained a search warrant and searched the house John and Dottie were renting. She took photographs of cement-like particles under a couch. She recov-

---

1. These two appeals have not been consolidated but were heard together at oral argument.

2. Russell claimed that he kept large amounts of cash in his safe because he was trying to hide it from his ex-wife while negotiating over child support and that he was involved in a lawsuit with two of his sisters regarding an inheritance.

ered the cement-like particles and a ball peen hammer and sent these items to a forensics laboratory. Detective DeWitt did not find the safe or its contents.

The following day, John, Dottie, Mark and Shari returned from Atlanta and were arrested and taken to the police station where each suspect was placed in a separate room. Dottie became upset and gave a written statement admitting that she and the others had burglarized Russell's house. She stated that she went for a car ride with John, Mark, Shari and Key and they had taken the safe. However, she stated that they found nothing in the safe but Russell's personal papers. After Dottie finished her statement, Detective DeWitt allowed her to speak with John. When she returned from speaking with John, she told Detective DeWitt that she had given a false statement because she was afraid she would go to jail and lose her kids. Dottie was pregnant at the time and had two small children at home.

Between December 1993 and January 1997, the trial was rescheduled approximately seventeen times and during those three years, John and Dottie went through a bitter divorce. In September 1996, John filed abandonment charges when Dottie left the children for several days with a teenage babysitter and he obtained temporary custody of the children. When Dottie regained custody of the children, she contacted Detective DeWitt and told her that she was afraid she would lose her children if she did not come forward and make another written statement. Some of the details in her 1996 statement varied somewhat from her 1993 statement. In exchange for her testimony, Dottie received a twelve-month suspended sentence with two years of unsupervised probation.

On January 27 and 28, 1997, John, Mark and Shari were tried together. Key was the first witness for the Commonwealth. He acknowledged that he had given a written statement but at trial he denied all details of that statement except that he

bought John's car for $200. Key admitted that he told not only Detective DeWitt about the burglary but that he had also told his father about it.[3] Russell testified that he had been out late the evening of the burglary at a friend's house to have dinner and he did not discover the burglary until the next morning. Forensic trace specialist, Barbara Wheeler, testified that her analysis of the cement-like particles revealed them to be safe insulation. She also testified that she found traces of this insulation on the hammer. Dottie testified substantially to the facts given in her two written statements with, again, a few discrepancies.

John testified that on December 5 or 6, 1993, he and Dottie talked about going out of town, they went to Mark and Shari's house and they all decided to make a short trip to Atlanta. John testified that they went to Atlanta, stayed at a motel, went to a bar, and generally had a good time. He denied Dottie's claim that he sold the stolen jewelry to a pawn shop. John admitted that he had sold his car for $200 just before they left and he spent $300 of his money to buy a newer used car. He also admitted that before he left, he paid $150 to his landlord to cover an unpaid rent deposit. He estimated that he spent about $150 on the trip. He testified that when they returned from Atlanta, he noticed that their house was in an unusual state of disarray. John acknowledged the hammer was his, but he denied using it to break open the safe. He testified that he never had any disagreements with his nephew and could not imagine why Key had accused his uncles of the Russell burglary. John claimed that Dottie accused him of the burglary because she feared losing her children. The jury convicted John and Mark of burglary in the second degree.

Prior to the penalty phase proceedings, Mark objected to the Daviess Circuit Court deputy clerk testifying from two out-of-county judgments of conviction

3. In juvenile proceedings, Key pled guilty to burglarizing Russell's home.

against him because she was not the custodian of records from those counties. The deputy clerk testified that she was the custodian of court records for the Daviess Circuit Court and that she had with her certified copies of two judgments of conviction naming Mark Skimmerhorn as the defendant. One judgment convicted him of felony rape and felony assault in Hopkins Circuit Court and the other judgment convicted him of felony promoting contraband in the first degree in Oldham Circuit Court. The clerk read from the certified copy of the Hopkins Circuit Court judgment of conviction which listed Mark's name, case number, the date of the offense, the date of the conviction, the crime for which he was convicted and the sentence received. She also testified to Mark's date of birth, but later admitted that the date of birth was not listed on the Hopkins Circuit Court judgment. Likewise, she read from the Oldham Circuit Court judgment of conviction which listed Mark's name, case number, birthdate, social security number, the date of the offense, the date of the conviction, the crime for which he was convicted and the sentence received.

Upon cross-examination, the deputy clerk admitted that while the certified copy of the Hopkins Circuit Court judgment of conviction listed "Mark Skimmerhorn" as the defendant, it did not list the defendant's date of birth or social security number. At a bench conference, Mark moved the trial court to dismiss the persistent felony offender in the first degree count because the Hopkins Circuit Court judgment failed to properly identify him. In response, the Commonwealth argued that the testimony of its next witness, Donald McDaniel (McDaniel), would verify the convictions.

McDaniel, a probation and parole officer for the Commonwealth for thirteen years, testified that he had care, custody and control of all records of all persons committed to the Department of Corrections, that those records had been made in the regular course of business and that those records showed that Mark Skimmerhorn had felony convictions of rape and assault in Hopkins Circuit Court and of promoting contraband in Oldham Circuit Court. McDaniel stated that the Department of Corrections records which show felony convictions in each of those courts stated Mark Skimmerhorn's date of birth as November 14, 1962, and his social security number as 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. McDaniel stated that Mark completed service on both sentences on June 27, 1993. The jury convicted Mark of the status offense of persistent felon in the first degree. These appeals followed.

John and Mark both raise the issue of insufficient evidence and contend that the trial court erred in not directing a verdict of acquittal. Their briefs list in minute detail every discrepancy in Dottie's testimony and the fact that Key recanted his written statement at trial. The Commonwealth responds by arguing that any discrepancy in testimony is simply a credibility issue for the jury.

In *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991), the Supreme Court stated the standard of review concerning a directed verdict as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed

verdict of acquittal. [*Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3 (1983).]

One example, in particular, where John and Mark attack the sufficiency of the evidence in their briefs is as follows:

> Directed verdict should have been granted to John Skimmerhorn [and Mark Skimmerhorn] because the Commonwealth failed entirely to meet its burden of proof. The victim of the burglary testified to two key facts: one, that the burglary had to have occurred between 1:30 and 5:50 p.m., and two, that—among other things—there was $10,000 in cash taken. The victim Charles Russell lived in a mobile home, and the safe was in his bedroom. There is absolutely no way that a burglar could have driven into his driveway, kicked his front door in, and busted open the lock on his bedroom door while he was there without his noticing it. No reasonable juror could possibly believe that the burglary occurred while Charles Russell was there, unless they also believed that Russell was in on it.

The Commonwealth responded to this argument by stating that Russell "testified that he had been out late on the evening of the burglary, having dinner at a friend's house."

Our careful review of the record reveals that Russell testified to two different timeframes. On direct examination, Russell testified that he "got home sometime late that evening...." On cross-examination, Russell admitted that the statement he had given to Det. Dewitt on the day following the robbery stated that someone broke into the trailer between 1:30 p.m. and 5:50 p.m. Dottie's first statement to Det. Dewitt included Dottie relating that when they went to the trailer "[i]t was late. I want to say it was between twelve and two." In her next statement, Dottie stated, "[o]n Sunday night, we went for a car ride." In his statement, Key stated that the burglary occurred on Sunday night.

■ We agree with the Commonwealth that witness credibility is strictly a jury function. A juror can believe part of the evidence and disbelieve other parts of the evidence. Dottie's two statements along with her testimony, Key's written statement and testimony and Russell's testimony provide sufficient evidence to convict John and Mark. Furthermore, direct physical evidence was taken from John's home in the form of safe insulation and a hammer with traces of the insulation on it. It was clearly not unreasonable for the jury to convict John and Mark of burglary in the second degree.

■ Mark's second issue on appeal can be viewed as containing two parts: (1) whether it was appropriate for the Daviess Circuit Court deputy clerk to testify during the penalty phase about the judgments of conviction from Hopkins and Oldham Circuit Courts since she was not a custodian of those records; and (2) whether the Hopkins Circuit Court judgment of conviction was relevant evidence when it did not identify Mark by date of birth or a social security number. "Whether to admit or exclude evidence to ensure the fairness of a trial is within the discretion of the trial court, and its determination will not be overturned on appeal in the absence of a showing of an abuse of such discretion." *Mullins v. Commonwealth*, Ky., 956 S.W.2d 210, 213 (1997).

First, we will address Mark's argument that the Daviess deputy clerk should not have been allowed to testify regarding the certified copies of the judgments of conviction from Hopkins and Oldham Circuit Courts. We agree that these public records for the purposes of this trial were hearsay. The basic purpose of the hearsay rule is to ensure that evidence offered in court is credible, having some indicia of trustworthiness. The hearsay exceptions reflect this principle. Kentucky Rules of Evidence (KRE) 803(8) states as follows:

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness:

Public records and reports. *Unless the sources of information or other circumstances indicate lack of trustworthiness*, records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law . . . [emphasis added].

Our Supreme Court recently discussed the rationale behind the reduced foundation requirement under KRE 803(8) in *Prater v. Cabinet for Human Resources, Commonwealth of Kentucky*, Ky., 954 S.W.2d 954, 958 (1997). The Court stated as follows:

The common law rationale for the admission of public records with reduced foundation requirements was that they were prepared in the discharge of public duty by persons having no motive to suppress or distort the truth or to manufacture evidence. *Voorhes v. City of Lexington*, [Ky., 377 S.W.2d 57, 60 (1964)]. Judge Weinstein also notes that the reduced foundation requirements are reflective of the fact that assurances of accuracy are greater for public records than for regular business records. Weinstein & Berger, *Weinstein's Evidence Manual*, § 16.07[01][a] (1996).

The Court noted that KRE 803(8) reserves some discretion to the trial court "to exclude the record even if it technically satisfies the foundation requirements of the rule." *Id.*

In Lawson, *The Kentucky Evidence Law Handbook*, § 8.70 (3d. ed., 1993), Professor Lawson noted that "[t]here is hardly anything in the case law of Kentucky concerning the foundation requirement for public records." In *Hackworth v. Hackworth*, Ky.App., 896 S.W.2d 914, 917 (1995), this

Court stated that if a public record is authenticated, relevant and its probative value outweighs its prejudicial value, it is admissible. However, *Hackworth* did not address what, if any, foundational testimony was required to admit a public record.

In *Commonwealth ex rel., Howard, Commissioner of Revenue v. Denham*, 303 Ky. 413, 197 S.W.2d 907 (1946), the only evidence introduced against a taxpayer to determine the amount due the Department of Revenue was a certified transcript of the Department's records which noted the amount of cigarette tax owed by Denham. The trial court dismissed the action declaring there to be no competent evidence to sustain a verdict. The former Court of Appeals was presented with the issue of whether the certified copy of the transcript, standing alone, was competent evidence. The Court relied on KRS 422.020 which stated in pertinent part that "[a]ny public record, kept by any state administrative agency, or copy duly certified by the custodian thereof, shall be prima facie evidence of its contents in all proceedings."[4] *Id.*, 303 Ky. at 414, 197 S.W.2d 907. The Court then stated: "Moreover, we find the generally accepted rule to be that a certified copy of a public record is admissible in evidence as proof of its contents." *Id.*

■ KRE 1005 states in pertinent part that "[t]he contents of . . . a document . . . filed and actually recorded . . . in a place where official records or documents are ordinarily filed, . . . if otherwise admissible, may be proved by copy, certified as correct in accordance with KRE 902 *or* testified to be correct by a witness who has compared it with the original [emphasis added]." A party seeking to introduce a public record must present a certified copy of that record *or* have a person who has compared the copy with the original testify that the document is authentic. Authentication, or establishing that the document is what it is

---

4. KRS 422.020 was repealed in 1992 when the Kentucky Rules of Evidence were enacted.

KRE 902 and 1005 contain provisions similar to that statute.

purported to be, is governed primarily by KRE 901 and 902. KRE 902 states, in pertinent part, as follows:

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

. . .

(4) Official records. An official record or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by an official having the legal custody of the record.

See also Kentucky Rules of Civil Procedure (CR) 44.01 ("An official record ... when admissible for any purpose, may be evidenced by ... a copy attested by the officer having the legal custody of the record....")

The idea behind Rule 902[5] is that the possibility of fraud, forgery, or misattribution of certain documents is so slight as to justify dispensing with extrinsic evidence of their authenticity. Self-authentication does not eliminate the requirement of relevancy, nor does it foreclose an opposing party from disputing the authenticity of the document. However, one writer has said that facts which make a document self-authenticating under Rule 902 also constitute cogent and compelling evidence as to its authenticity, and that, accordingly, the trier of fact should be regarded as bound to find such a document authentic unless sufficient counterproof on this issue is adduced.

29A Am.Jur.2d Evidence § 1180 (1994) (footnotes omitted).

■ In this case, the Commonwealth presented a certified copy of the Hopkins Circuit Court judgment of conviction. Mark's argument that the Hopkins Circuit Court records could only be introduced into evidence by a Hopkins Circuit Court clerk overlooks KRE 1005. Pursuant to KRE 1005, a certified copy is self-authenti-

cated and does not require testimonial declarations of its verity. In this case, since the record was certified, there was no requirement that the deputy clerk or any other person testify from personal knowledge. The deputy clerk did not serve any foundational purpose when she read the judgment into the record—she merely read from the certified copy of the judgment just as any other person could have done. In this case, the judgment of conviction was self-authenticated, relevant and it was excepted from the hearsay rule. We conclude that the trial court did not err in allowing the judgment of the Hopkins Circuit Court to be read into evidence.

■ The remaining issue is whether the Hopkins Circuit Court judgment of conviction was admissible as evidence since it did not identify Mark by birthdate and social security number. Since the Hopkins Circuit Court judgment of conviction was certified, it bore a presumption of validity of the information in that judgment. When the prosecution seeks an enhanced sentence for an offense based upon a prior conviction, it is an essential part of the Commonwealth's case to provide proof that the defendant is the person who was previously convicted. Many jurisdictions hold that proof of a previous conviction for enhanced sentence purposes cannot be proved by mere name alone but that affirmative evidence must be presented. See Annotation, Evidence of Identity for Purposes of Statute as to Enhanced Punishment in Case of Prior Conviction, 11 A.L.R.2d 870 (1950). However, Kentucky courts have long ago determined that identity of name is prima facie evidence of identity of a person.

In Sullivan v. Commonwealth, 222 Ky. 771, 2 S.W.2d 666 (1928), the Court addressed the issue of proofing a prior conviction for enhanced sentence purposes as follows:

5. This refers to Federal Rules of Evidence 902    which is identical to KRE 902.

The record evidence of the previous indictment, trial, and conviction of Charlie Sullivan for the same offense was read to the jury. It is true that no witness deposed that the Charlie Sullivan then on trial was the same Charlie Sullivan previously tried and convicted. However, the principle, "Identity of name is prima facie evidence of identity of person," has long prevailed in this jurisdiction. As applied in criminal cases, the principle was discussed at length in *Belcher v. Commonwealth*, 216 Ky. 126, 287 S.W. 550, in a case presenting the same facts exactly as here. Though no one in that case testified that the Arthur Belcher being tried was the same person who under that name had previously been convicted of possessing intoxicating liquors, it was held that identity of name was prima facie evidence of identity of person, and, there being no evidence to the contrary, the conviction was sustained. The opinion cites a formidable array of authority to support it.

*Id.*, 222 Ky. at 772, 2 S.W.2d 666 (citations omitted).

In *Jones v. Commonwealth*, Ky., 457 S.W.2d 627, 631 (1970) (emphasis original), the Court again addressed the need to identify a person charged as a habitual criminal. The former Court of Appeals stated:

The proof was of a former conviction of "Robert Jones, Jr.". Jones maintains that this was not sufficient to warrant his conviction on the habitual criminal charge because there was no proof that he was the *same* Robert Jones, Jr. who was previously convicted. Again we have a claim with no merit in it. Proof of identity of name is prima facie evidence of identity of person. *Foster v. Commonwealth*, Ky., 415 S.W.2d 373; *Belcher v. Commonwealth*, 216 Ky. 126, 287 S.W. 550. A prima facie case having been established, the onus was on Jones to show that he was not the person who was previously convicted.

*Accord Fanelli v. Commonwealth*, Ky., 418 S.W.2d 740, 744–745 (1967); *Green v. Commonwealth*, Ky., 413 S.W.2d 329, 331 (1967); and *Marcum v. Commonwealth*, Ky., 411 S.W.2d 462, 465 (1967).

■ Based upon these cases, the proof that Mark Skimmerhorn's name appeared on the Hopkins Circuit Court judgment of conviction was *prima facie* evidence that it referred to the same Mark Skimmerhorn found guilty of burglary in the second degree in the Daviess Circuit Court. The Commonwealth having made a *prima facie* case, as a defense Mark could attempt to show that he was not the person previously convicted. Mark has offered no proof whatsoever that he was not the same person. Our holding as to the deputy clerk's testimony makes it unnecessary for us to address the issue concerning the probation and parole officer's testimony. For the foregoing reasons, we affirm the judgment of the Daviess Circuit Court.

All concur.