# Order

Michigan Supreme Court
Lansing, Michigan

June 5, 2009

126509

PEOPLE OF THE STATE OF MICHIGAN,
        Plaintiff-Appellee,

v

RICKY ALLEN PARKS,
        Defendant-Appellant.
_____/

SC: 126509
COA: 244553
Shiawassee CC: 02-007574-FC

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

On October 2, 2008, the Court heard oral argument on the application for leave to appeal the May 18, 2004 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

YOUNG, J. (*concurring*).

I concur in the decision to deny leave to appeal and write to respond to what I believe is Justice Markman's artificially narrow definition of "conduct"—one that ultimately and ironically would give rape victims fewer privacy interests than prostitutes under the rape shield statute. I do not believe that the statute requires this result. I also write to respond to Chief Justice Kelly's constitutional argument.

## I. Factual Background and Procedural History

Because the dissenting statements offered by Chief Justice Kelly and Justice Markman contain significant gaps that fail to capture the ambulatory nature of the defendant's claims of error, I offer the following complete and chronological recitation of the facts and the relevant procedural history of this case.

The complainant child, D.W., has experienced a troubled childhood. When she was three or four years old, her step-grandfather allegedly sexually abused her by fondling her and requiring her to perform fellatio on him. When she was five years old, she moved to Michigan to live with her mother and stepfather (defendant Ricky Allen Parks). There, she admitted to them that she had been sexually abused by her step-grandfather. Defendant recalled:

> She had told us the stories about how her grandfather would have her in his bed at night and how he would touch her vaginal areas and then how he would make her touch his—what she called the weenie and how he had . . . her put it in her mouth and talked about it getting sick on her belly and giving her medicines . . . .

D.W.'s mother immediately contacted the Family Independence Agency (FIA)[1] in Owosso, which referred her to a physician. The physical examination conducted by the physician did not rule out fondling. The FIA investigator concluded that D.W. "has either been exposed to an extreme amount of sexual activity or that she has been abused in the past, possibly with threats of physical harm were she to reveal what has taken place." No charges were ever brought against D.W.'s step-grandfather.

By November 2001, D.W. was 10 years old and living with defendant, his then-girlfriend, and five other children.[2] After D.W. exhibited age-inappropriate sexual knowledge and behavior at school, the school's social worker interviewed her. During that interview, D.W. stated that defendant had touched her in her vaginal area. The social worker then contacted Child Protective Services (CPS) regarding the allegations of sexual abuse. Although defendant denied the allegations, CPS placed D.W. in foster care. Further investigation led to additional details: D.W. claimed that defendant twice followed her into the bathroom at their house and penetrated her, once with one of his fingers into her vagina and the other time with his penis into her mouth. Pursuant to MCL 750.520b, defendant was subsequently charged with two counts of first-degree criminal sexual conduct (CSC-I).[3]

At a motion in limine hearing, the prosecution sought to exclude evidence of the prior allegation that D.W. made against her step-grandfather. Defense counsel opposed the prosecutor's motion, but on narrow grounds—he sought to use the prior allegation "solely for impeachment purposes." He explained that he anticipated asking D.W.

---

[1] The FIA is now known as the Department of Human Services.

[2] Defendant had custody of three children, including D.W., while his then-girlfriend had three other children of her own. As Justice Markman's dissenting statement indicates, D.W.'s mother had moved out of state and left her children with defendant after she was apparently charged with drug offenses.

[3] MCL 750.520b(1) provides: "A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person . . . if . . . (a) [t]hat other person is under 13 years of age." MCL 750.520a(o) defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required."

whether "she had ever made any reports of any other types of activity . . . ." He expected "that [D.W.] would say no," as she did at a preliminary hearing, and he would then call other witnesses to testify that she had, in fact, previously made an allegation of sexual abuse. Thus, the then-11-year-old complainant would be impeached. The trial court agreed with the prosecution and excluded the evidence under the rape shield statute.[4] Trial proceeded without evidence of D.W.'s previous abuse, and the jury convicted defendant on both charged counts of CSC-I. He was subsequently sentenced to a term of 7 to 15 years' imprisonment.

On appeal, defendant argued that he should have been allowed to question D.W. to show that she had made similar *false* allegations in the past.[5] The Court of Appeals, in an unpublished opinion per curiam, issued May 18, 2004 (Docket No. 244553), affirmed defendant's convictions and held that defendant failed to make an offer of proof with respect to the falsity of D.W.'s prior allegation, as required under MRE 103(a)(2).[6] Undeterred by the defendant's failure to offer proof at the appropriate time, this Court accepted his argument and remanded to the Shiawassee Circuit Court for an evidentiary hearing to determine whether D.W. had, in fact, made a false accusation of sexual abuse against another person.[7]

---

[4] MCL 750.520j provides, in pertinent part:

> (1) Evidence of specific instances of the victim's sexual conduct . . . shall not be admitted under [MCL 750.520b to 750.520g] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:

> (a) Evidence of the victim's past sexual conduct with the actor.

> (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

[5] Under both the plain meaning of the statute and this Court's precedent in *People v Jackson*, 477 Mich 1019 (2007), the rape shield statute does not encompass *false* allegations of sexual abuse made by a complainant, because false allegations of sexual abuse are not "sexual conduct."

[6] MRE 103(a) provides, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . (2) . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

[7] *People v Parks*, 478 Mich 910 (2007). I joined in Justice Corrigan's dissenting statement, which is worth repeating here, in pertinent part:

> I respectfully dissent from the majority's decision to remand this case to the trial court for an evidentiary hearing, and to thereby give defendant a

On remand, the trial court affirmed defendant's convictions, ruling that there was "absolutely no evidence, zero evidence[,] of any prior false accusations made by the child. . . ." This finding was based on the FIA investigator's determination, contemporaneous with D.W.'s allegation of abuse against her step-grandfather, that the young child "ha[d] either been exposed to an extreme amount of sexual activity or . . . ha[d] been abused in the past." Moreover, it was underscored by defendant's own testimony that he believed D.W.'s allegations against her step-grandfather to be true both at the time they were made *and presently*.

Defendant has abandoned his prior argument and, hoping that his third theory would be the charm, sought to introduce the evidence for yet *another* purpose: as an alternative explanation for D.W.'s age-inappropriate sexual knowledge and behavior. Under this theory, defendant now claims that he is entitled to present evidence of the previous abuse D.W. suffered to show that she obtained her age-inappropriate sexual knowledge and behavior from a source other than defendant.

Obviously, at the time of trial, defendant did not offer this third basis for the admission of D.W.'s alleged prior sexual abuse. Accordingly, this issue is unpreserved. Neither Justice Markman nor Chief Justice Kelly explains why the defendant should be allowed to maintain a theory of innocence that was neither articulated at the time of trial nor at the time of the defendant's first appeal to this Court. Indeed, the tortuous procedural history of this case—including the defendant's seriatim efforts to introduce the excluded evidence—is conspicuously absent from either of their dissenting statements. The failure to preserve the appropriate claim of error is, by itself, a sufficient—and my primary—basis for denial.

## II. Analysis
### A. Rape Shield Statute

Michigan's rape shield statute,[8] enacted in 1974 as part of a comprehensive reform of Michigan's criminal sexual assault statutes,[9] is a broad exclusionary rule that prohibits

---

> *second* chance to offer proof that the complainant made a prior false accusation of sexual abuse against another person. The majority ignores the fact that defendant *already* had an opportunity to offer proof of the alleged falsity of the prior accusation, and that he failed to do so. Under the plain language of MRE 103(a), error may not be predicated on the exclusion of evidence where no offer of proof was made. Yet the majority, for reasons that it wholly fails to explain, now gives defendant a second bite at the apple, in contravention of MRE 103(a). [*Id.* at 912 (Corrigan, J., dissenting) (emphasis in original).]

[8] MCL 750.520j.

the introduction of evidence of a sexual assault victim's previous sexual conduct, with certain narrow exceptions. Before the rape shield statute was enacted, sexual assault trials often focused on a *victim's* sexual history rather than on the defendant's alleged actions.[10] Thus, as this Court has previously explained, the enactment of rape shield laws across the country was "a reflection of a nationwide concern about the prosecution of sexual conduct cases."[11]

The rape shield statute, MCL 750.520j, provides in part:

> (1) Evidence of specific instances of the victim's sexual conduct . . . shall not be admitted under [MCL 750.520b to 750.520g] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
>
> (a) Evidence of the victim's past sexual conduct with the actor.
>
> (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

At issue in this case is whether prior *involuntary* sexual activity—the sexual abuse D.W. allegedly suffered by her step-grandfather—constitutes "sexual conduct" for the purposes of the statute's exclusionary rule. If such involuntary sexual activity does constitute "sexual conduct," then the defendant is not entitled to question the complainant about such conduct. This includes a complainant's previous *allegations* of sexual abuse not proven to be false.[12]

The Legislature did not specifically define the term "conduct." Therefore, it is appropriate to look to the dictionary definition to discern the term's meaning.[13]

---

[9] MCL 750.520a *et seq*.

[10] See, e.g., *People v McLean*, 71 Mich 309, 312 (1888) ("Evidence that the prosecutrix is a common prostitute, or that her character for chastity is bad, is admissible."). The rape shield statute was aimed at putting to rest the mindset expressed by Chief Justice Cooley in another context, that "[t]he probability that a woman who conducts herself properly will be frequently assaulted is very small . . . ." *Derwin v Parsons*, 52 Mich 425, 427 (1884).

[11] *People v Arenda*, 416 Mich 1, 8 (1982).

[12] See *People v Jackson*, 477 Mich at 1019.

[13] *People v Thompson*, 477 Mich 146, 151-152 (2007).

"Conduct" is relevantly defined, as one's "personal behavior."[14]  This definition is silent about whether "conduct" encompasses only *voluntary* "personal behavior" or both voluntary *and involuntary* "personal behavior."  The term's plain meaning in the criminal context, however, implies that *both* voluntary behavior *and* involuntary behavior are "conduct."  Justice Markman's understanding of the term "conduct" artificially restricts the term to one's voluntary behavior only.  Instead, it encompasses *all* of one's "personal behavior."[15]

An examination of the statutory scheme as a whole underscores why Justice Markman's construction of "conduct" is too limited.  MCL 750.520a provides definitions for Chapter LXXVI of the Michigan Penal Code, which encompasses the rape shield statute (MCL 750.520j).  Although the section does not define the word "conduct," it does define both "actor" and "victim" with reference to their "conduct."  An "actor" is someone "accused of criminal sexual conduct," MCL 750.520a(a), while a "victim" is someone "subjected to criminal sexual conduct," MCL 750.520a(p).  By including these definitions, the Legislature expressed its understanding that "sexual conduct" is something that *both* "actors" *and* "victims" take part in—"actors" voluntarily and "victims" involuntarily.  The protections of the rape shield statute, therefore, do not distinguish involuntary "sexual conduct" experienced as a victim of sexual abuse from

---

[14] *Random House Webster's College Dictionary* (1997).  This is the longstanding definition of the term.  See Webster, *A Compendious Dictionary of the English Language* (New York, NY: Crown Publishers, 1970 facsimile of 1806 edition), p 61 ("behavior").

[15] The criminal defense of duress aptly illustrates why Justice Markman's construction is underinclusive.  Someone who maintains a duress defense admits that otherwise criminal acts are part of his "conduct," but seeks to excuse it as *involuntary.*  Thus, though involuntary, the act remains a person's conduct.  *People v Merhige*, 212 Mich 601, 610-611 (1920), states the rule of duress: "An act which would otherwise constitute a crime may also be excused on the ground that it was done under compulsion or duress.  The compulsion which will excuse a criminal act, however, must be present, imminent and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done."  (Quotation marks and citation omitted.)  Particularly telling is the Court's subsequent discussion: "*Whether the defendant was responsible for his conduct* on September 19th and *whether his actions on that occasion were voluntary*, would be a fair question for a jury under all the circumstances of the case."  *Id.* at 611 (emphasis added).  Rather than being "a single, stray reference to [conduct]," as Justice Markman indicates, *post* at 26, this understanding of "conduct" as encompassing *all* of one's "personal behavior," not just volitional behavior, illustrates a foundation of our criminal law.  Moreover, the alleged criminal sexual conduct that took place between D.W. and her step-grandfather—fondling and fellatio—*requires* (at least) two participants.  The fact that, with respect to D.W., this alleged sexual conduct was forced is not relevant to whether it was "conduct" within the meaning of the statute.

voluntary "sexual conduct" engaged in as a consenting adult. To hold otherwise would presume that the Legislature intended to give prostitutes more protection than rape victims. I do not think the plain meaning of the term "conduct" within the context of the statute conveys *that* particular legislative intent.

Moreover, a discarded draft of this provision supports this natural construction of the phrase "sexual conduct." "[B]y comparing alternate legislative drafts, a court may be able to discern the intended meaning for the language actually enacted."[16] The bill, as introduced in the Senate on February 28, 1974, originally provided that "[p]rior *consensual* sexual activity between the victim and any person other than the actor shall not be admitted into evidence in prosecutions under sections 520B to 520I."[17] The House subsequently amended the bill and passed a substitute bill that *deleted* the word "consensual."[18] It is that House substitute bill that was enacted into law *instead of* the bill that was initially proposed.[19] Therefore, the fact that the Legislature *specifically deleted* the word "consensual" provides additional support for the conclusion that the rape shield statute applies to both consensual and nonconsensual sexual conduct.[20]

---

[16] *In re Certified Question (Kenneth Henes Special Projects v Continental Biomass Industries, Inc)*, 468 Mich 109, 115 n 5 (2003).

[17] SB 1207, § 520J(2). (Emphasis added.)

[18] 1974 Journal of the House 4356-4363.

[19] 1974 Journal of the Senate 1495-1499. See also 1974 PA 266.

[20] Justice Markman correctly states that the enacted version of the bill replaced the phrase "consensual sexual activity" with the phrase "sexual conduct." Nevertheless, his argument that the two terms are identical does not take into account the fact that amendments of the definitional provisions in the statute provide additional support for a distinction between "consensual sexual activity" and "sexual conduct." The enacted version of the definitional provisions relating to criminal sexual conduct defined "actor" and "victim" as participants in "sexual conduct." In the original SB 1207, however, the provisions defined "actor" and "victim" without reference to their "sexual conduct." "Actor" was defined as "a person accused of sexual assault," SB 1207, § 520A(A), while "victim" was defined as "the person alleging to have been sexually assaulted," § 520A(J). When the word "consensual" was deleted from the statute, those definitions were amended to reference the parties' participation in "sexual conduct," the "actor" as someone "accused of criminal sexual conduct," MCL 750.520a(a), and the "victim" as someone "subjected to criminal sexual conduct," MCL 750.520a(p). Thus, even if Justice Markman's distinction between "conduct" and "activity" were valid, the amendment of the definitional provision that contemplates an expansive understanding of "sexual conduct" puts his distinction to rest and incorporates both consensual sexual conduct and nonconsensual sexual conduct.

This is consistent with our caselaw applying the rape shield statute to victims of prior sexual abuse.  In *Arenda*, this Court prohibited the admission, under the rape shield statute, of "*any* evidence of sexual conduct between the victim [an eight-year-old boy] and any person other than defendant."[21]  Likewise, *People v Morse* articulated a specific test for admitting evidence of a complainant's prior sexual abuse *notwithstanding* the applicability of the rape shield statute.[22]

While not controlling the interpretation of this state's statute, it is nevertheless reassuring that nearly all states ruling on this question have read their rape shield protections as encompassing both voluntary sexual conduct and involuntary sexual conduct.  Twenty other states specifically hold that sexual abuse falls under rape shield protections.[23]  Only

---

[21] *Arenda*, 416 Mich at 6 (emphasis added).  While Justice Markman correctly notes that *Arenda* primarily dealt with the constitutionality of the rape shield statute, its application of the rape shield statute is *very* relevant to this case.  The victim in that case was an eight-year-old boy, and the defendant sought to cross-examine the victim regarding whether he had engaged in any previous sexual activity.  Moreover, the defendant sought to introduce the evidence to explain an alternative basis for the victim's age-inappropriate sexual knowledge.  The Court excluded evidence of *all* instances of sexual conduct between the eight-year-old victim and any person other than the defendant.  The Court did not make *any* distinction between voluntary sexual conduct and involuntary sexual conduct.

[22] 231 Mich App 424 (1998).  The *Morse* panel specifically discussed the applicability of the statute: "In Michigan, as in our sister states, rape-shield statutes are typically invoked where the victim is an adult.  However, our courts and others have ruled on the applicability of rape-shield statutes in cases of child sexual abuse."  *Id.* at 430, citing *Arenda*, 416 Mich at 6.

[23] See *State v Townsend*, 366 Ark 152, 160 (2006) ("[E]vidence of the prior sexual abuse of a minor is within the ambit of the rape-shield statute."); *People v Aldrich*, 849 P2d 821, 824 (Colo App, 1992) ("[T]he rape shield statute encompasses involuntary acts within the meaning of prior sexual conduct . . . ."); *Baughman v State*, 528 NE2d 78, 79 (Ind, 1988) ("Appellant contends that the trial court erred by preventing him from presenting evidence that [the victim] had been sexually molested by her step-father . . . .  The evidence sought to be introduced was of the type which the legislature deemed should be excluded in a case of this nature.  It falls clearly within the parameters of the statute . . . ."); *State v Jones*, 490 NW2d 787, 790 (Iowa, 1992) ("We think the term ['] past sexual behavior['] as it is used in the rule clearly encompasses prior sexual abuse perpetrated upon the victim."); *State v Michel*, 633 So 2d 941, 944 (La App, 1994) ("[Louisiana's rape shield law] was correctly applied in this case to prevent any exploration of a possible sexual molestation of the victim in 1988."); *State v Jacques*, 558 A2d 706, 708 n 2 (Me, 1989) ("We reject, as providing insufficient protection to victims, the defendant's proposed interpretation of 'sexual behavior' to apply only to a victim's 'volitional sexual behavior.'"); *Commonwealth v Hynes*, 40 Mass App 927, 929 (1998) ("Evidence of sexual abuse by a third

party is generally excluded under the rape-shield statute."); *State v Carpenter*, 459 NW2d 121, 125-126 (Minn, 1990) ("The excluded evidence at issue here [is] the alleged prior digital penetration of [the victim] . . . . We find, as did the trial court, the evidence of previous sexual conduct defense counsel sought to introduce to be inadmissible under [Minnesota's rape shield law]."); *Peterson v State*, 671 So 2d 647, 657 (Miss 1996) ("[Mississippi's rape shield law] prohibits the introduction of evidence of a victim's past sexual behavior unless it falls under one of the three exceptions . . . . The question [at issue] was not whether she had made any false allegations of a past sexual offense [which are admissible] . . . , rather it was whether she had made any allegations at all of such an offense and is therefore improper."); *State v Kelley*, 83 SW3d 36, 40 (Mo App, 2002) ("The offer included evidence that the sexual [abuse] actually occurred and, therefore, must be presumed inadmissible under the rape shield statute."); *State v Rhyne*, 253 Mont 513, 519 (1992) ("[U]nder [Montana's rape shield law], sexual conduct of the victim which is inadmissible includes prior sexual abuse."); *State v Bass*, 121 NC App 306, 309-310 (1996) ("We conclude that the prior abuse alleged here is "sexual activity" within the ambit of [North Carolina's rape shield law]."); *State v Budis*, 125 NJ 519, 532-533 (1991) ("When a defendant seeks to elicit evidence of the prior sexual abuse of a child, the Rape Shield Statute directs trial courts to conduct a pre-trial *in camera* hearing."); *State v Montoya*, 91 NM 752, 753 (NM App, 1978) ("Sexual intercourse is sexual conduct whether by consent or force. [New Mexico's rape shield law] is not limited to sex by consent; rather, by its unlimited wording, it applies to all forms of past sexual conduct."); *State v Smelcer*, 89 Ohio App 3d 115, 122 (1993) ("The trial court refused to allow the admission of the evidence, stating that the rape shield law precluded evidence concerning prior sexual abuse of [the victim]. We find that this evidence was properly excluded."); *State v Wright*, 97 Or App 401, 406 (1989) ("We hold that 'past sexual behavior' means a volitional or non-volitional physical act that the victim has performed for the purpose of the sexual stimulation or gratification of either the victim or another person or an act that is sexual intercourse, deviate sexual intercourse or sexual contact, or an attempt to engage in such an act, between the victim and another person."); *Commonwealth v Johnson*, 389 Pa Super 184, 188 (1989) ("[A]ssaultive sexual activity is covered by the Rape Shield Law . . . ."); *Ex parte Rose*, 704 SW2d 751, 756 (Tex Crim App, 1984) ("Reading the phrase or term 'sexual conduct' in the context in which it is used in [Texas's rape shield law] and in accordance with common usage, we hold that it encompasses sexual activity or conduct whether willingly engaged in or not . . . ."); *State v Quinn*, 200 W Va 432, 438 (1997) ("[E]vidence that the alleged victim of a sexual offense has made statements about being the victim of sexual misconduct, other than the statements that the alleged victim has made about the defendant and that are at issue in the state's case against the defendant, is evidence of the alleged victim's 'sexual conduct' and is within the scope of West Virginia's rape shield law . . . unless the defendant establishes to the satisfaction of the trial judge outside of the presence of the jury that there is a strong probability that the alleged victim's other statements are false."); *State v Pulizzano*, 155 Wis 2d 633, 643 (1990) ("The prior sexual assault [the victim] experienced clearly constitutes 'sexual conduct' as that term is defined in [Wisconsin's rape shield law].").

three states concur with Justice Markman in denying the applicability of rape shield provisions to involuntary sexual abuse.[24] A fourth, New Hampshire, has enacted a statute expressly limiting exclusion to consensual sexual conduct.[25]

Ultimately, there is a strong textual basis for concluding that the term "conduct," as it is used in the rape shield statute, encompasses both voluntary and involuntary behavior. The Legislature's decision to enact a broad exclusionary rule containing limited and specific exceptions is *itself* a policy decision,[26] which must be respected unless it is unconstitutional.

### B. Constitutional Challenge to the Rape Shield Statute

Notwithstanding the requirements of the rape shield statute, a criminal defendant has the constitutional right to present a defense. The Sixth Amendment of the United States Constitution and art 1, § 20, of the Michigan Constitution contain identical provisions giving a criminal defendant the right to "be confronted with the witnesses against him . . . ."[27] In interpreting the Confrontation Clause, the United States Supreme Court maintains that the right to present a defense is a fundamental right afforded to criminal defendants.[28] Nevertheless, it is not absolute. The protections of the Sixth Amendment may "bow to accommodate other legitimate interests in the criminal trial process."[29] Indeed, courts have "'wide latitude' to limit reasonably a criminal

---

[24] *Raines v State*, 191 Ga App 743, 744 (1989) ("[A] prior rape committed against the victim has nothing whatsoever to do with *her* past sexual behavior."); *Chapman v State*, 117 Nev 1, 5 (2001) ("A child-victim's prior sexual experiences may be admissible to counteract the jury's perception that a young child would not have the knowledge or experience necessary to describe a sexual assault unless it had actually happened."); *State v Markle*, 118 Wash 2d 424, 438 (1992) ("[The] rape shield statute does not provide a basis for excluding evidence of prior sexual abuse of the complaining witness . . . .").

[25] NH Rev Stat Ann 632-A:6(II) provides that "[p]rior consensual sexual activity between the victim and any person other than the actor shall not be admitted into evidence in any prosecution under this chapter."

[26] See Nelson, *What is textualism?*, 91 Va L R 347, 398-403 (2005).

[27] The Sixth Amendment of the United States Constitution was held applicable to the states through the Fourteenth Amendment in *Pointer v Texas*, 380 US 400, 406 (1965).

[28] *Crane v Kentucky*, 476 US 683, 690 (1986). Additionally, art 1, § 13, of the Michigan Constitution provides that "[a] suitor in any court of this state has the right to . . . defend his suit, either in his own proper person or by an attorney." See also *People v Hayes*, 421 Mich 271, 278 (1984).

[29] *Michigan v Lucas*, 500 US 145, 150 (1991) (quotation marks and citations omitted).

defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"[30]

This Court's decision in *People v Hackett* requires a court to determine the constitutionality of exclusion of evidence under the rape shield statute on a case-by-case basis,[31] as long as "[t]he defendant . . . make[s] an offer of proof as to the proposed evidence and . . . demonstrate[s] its relevance to the purpose for which it is sought to be admitted."[32]   Only then does a trial court possess the relevant information to decide whether a defendant is constitutionally entitled to present particular evidence excluded under the rape shield statute.

Here, defendant has only offered proof that the prior allegations were relevant to D.W.'s *credibility*.  The Constitution does not require evidence of sexual conduct, such as these prior allegations, to be introduced when the defendant's *only* proffered reason for introducing such evidence is to wage a general attack on a witness's credibility, as opposed to a specific attack on a witness's "possible biases, prejudices, or ulterior motives . . . ."[33]   The Sixth Circuit Court of Appeals decision in *Boggs v Collins* is instructive on this point:

> No matter how central an accuser's credibility is to a case—indeed, her credibility will almost always be the cornerstone of a rape or sexual assault case, even if there is physical evidence—the Constitution does not require that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct.[34]

Our Legislature has determined that the fact that a complainant had been abused in the past is simply irrelevant to her present credibility.  This would seem to be an especially important policy when such prior sexual abuse occurred when D.W. could have been as young as three years old and when D.W. made her prior allegations of abuse when she was five years old.

Defendant's latest and third argument for introducing the evidence—explaining D.W.'s age-inappropriate sexual knowledge and behavior—is somewhat more

[30] *Id.* at 149, quoting *Delaware v Van Arsdall*, 475 US 673, 679 (1986).

[31] *People v Hackett*, 421 Mich 338 (1984).

[32] *Id.* at 350.

[33] *Davis v Alaska*, 415 US 308, 316 (1974).

[34] *Boggs v Collins*, 226 F3d 728, 740 (CA 6, 2000).

compelling.[35]  By failing to introduce this theory of admissibility at trial, however, defendant has forfeited it and bears the burden to show:  "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected substantial rights."[36]  And, if defendant can meet his burden, this Court must exercise its discretion to reverse only when "the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings."[37]

Defendant has failed to show that error occurred, much less that it was clear or obvious.  As noted earlier, the constitutional right to present a defense must be balanced against the state's interest in protecting the integrity of criminal sexual conduct trials and the privacy of complainants.  *Hackett* expressed that constitutional concerns might trump the rape shield statute when showing (on a proper offer of proof) that the complainant's prior victimization is probative of her bias or ulterior motive against the criminal defendant.[38]  Defendant does not make such a claim here.

The Court of Appeals decision in *People v Morse* held that, before a jury may hear evidence of prior sexual abuse against a complainant, the trial judge must determine (at

---

[35] Defendant's new theory, however, is not without its holes: because D.W. was abused as a very young child, she might be especially able to recognize and describe the abuse she is alleged to have suffered from defendant.  Indeed she had her own childishly graphic terms for a penis ("weenie"), ejaculation ("[the weenie] got sick"), and ejaculate ("medicine").  Chief Justice Kelly, however, struggling to bolster the relevance of the evidence, suggests that D.W. cannot use similar language to describe similar events that happened to her.  Her explanation fails to persuade.  The graphic terms that D.W. used to describe the alleged instances of sexual abuse were part of *her own* vocabulary.  The mere fact that she has this unique vocabulary to describe *all* the alleged instances of sexual abuse does not make it "extremely unlikely" for D.W. to have been abused both by her step-grandfather and by defendant.  *Post* at 17.  If Chief Justice Kelly "[does] not suggest[] that D.W.'s behavior encouraged someone to sexually abuse her," *id.* at 17 n 54, she nevertheless *does* suggest that, in order to be believed, a victim of sexual abuse had better come up with a different way to describe any subsequent abuse she suffers.  I see little to effectively distinguish this "one and done" rule for sexual assault victims, that "it is extremely unlikely that both defendant and D.W.'s [step-]grandfather abused D.W. in the same manner," *id.*, from the nineteenth-century sensibility that the rape shield statute intended to put to rest: that "[t]he probability that a woman who conducts herself properly will be frequently assaulted is very small . . . . " *Derwin*, 52 Mich at 427.

[36] *People v Carines*, 460 Mich 750, 763 (1999).

[37] *Id.* at 774.

[38] *Hackett*, 421 Mich at 348.

an in camera hearing): (1) that the proffered evidence is relevant, (2) that another person was *convicted* of criminal sexual conduct (CSC) involving the complainant, and (3) that the facts underlying the previous conviction are significantly similar to the case before it.[39]

Because D.W.'s step-grandfather was not charged with CSC, let alone convicted of such a crime, evidence of previous abuse is not eligible for introduction at trial under *Morse. Morse* appropriately balanced the defendant's necessity for introducing a defense with the state's interests in protecting the integrity of CSC trials and the privacy of complainants. It is much less invasive to a complainant if the previous abuse suffered is *already* a matter of public record that had previously been examined in open court. Accordingly, there is no compelling justification for extending this test to previous acts of CSC committed against a complainant that have not already withstood the publicity of a trial.[40]

Defendant is, therefore, not constitutionally entitled to introduce evidence of the previous abuse D.W. suffered. Accordingly, he is not entitled to a new trial.

### III. Conclusion

For the reasons stated, I concur in this Court's decision to deny leave to appeal. D.W.'s prior sexual victimization is covered under the plain meaning of the rape shield statute, and the exclusion of that evidence pursuant to the statute did not violate defendant's constitutional rights. Accordingly, he is not entitled to a new trial.

CORRIGAN, J., joins the statement of YOUNG, J.

KELLY, C.J. (*dissenting*).

I respectfully dissent from the majority's decision to deny leave to appeal in this case. Defendant sought to introduce at trial evidence that it was equally likely that

---

[39] *Morse*, 231 Mich App at 437. Like defendant's latest argument, the defendant in *Morse* sought to introduce the evidence in order to provide an alternate source for the complainant's age-inappropriate sexual knowledge.

[40] Justice Markman implies that defendant had no way of defending against the medical expert's conclusion that D.W. had likely been abused. This is simply incorrect. There was nothing to prevent the defendant from questioning the causal relationship between the witness's conclusion and *the abuse that defendant was charged with committing*; he simply was barred from exploring the causal relationship between the witness's testimony and D.W.'s alleged previous abuse.

another person committed the crime with which he was charged. The trial court's refusal of his request violated defendant's Sixth Amendment right of confrontation.[41]

Because the excluded evidence was so important and its exclusion undoubtedly tainted the verdict, I would reverse the conviction and remand the case for a new trial.

FACTS

Defendant, Ricky Parks, was convicted of two counts of first-degree criminal sexual conduct (CSC-I)[42] for molesting his nine-year-old stepdaughter, D.W.[43] The allegations against defendant arose when D.W. told a school social worker that defendant had sexually abused her. D.W., a mentally challenged child, had been abandoned by her mother and left with defendant. She had suffered a closed head injury when she fell from a golf cart while living with her grandparents and was left with serious developmental problems.

Some years later, when D.W. was living with defendant, locks had to be put on the doors because she would leave the house naked. Her behavior at school had sexual overtones. When asked at home why she was misbehaving, D.W. answered that her grandfather used to bring her to his bed, touch her vaginal area, and have her touch his penis. She claimed that he put his penis in her mouth, as well as his fingers in her vagina. She referred to her grandfather's penis as his "weenie" and described how, when she put it in her mouth, it "got sick on her belly." D.W. made some of the allegations against her grandfather after she was caught inappropriately fondling her brother. She then said that she was "trying to make medicine to wash his weenie off."

Defendant and D.W.'s mother obtained counseling for D.W. at school. They also reported the allegations D.W. made against her grandfather to the Department of Social Services,[44] but no charges were ever brought against the grandfather. Records show that a protective services case was opened in 1996, prompted by allegations that D.W.'s grandfather abused her. However, it was closed because D.W. failed to disclose any abuse while talking to agency personnel.

Nonetheless, the social service caseworker concluded in 1996 that "the statements made to mother and step-father with detail indicate that this child has either been exposed to an extreme amount of sexual activity or that she has been abused in the past." Also in 1996, an examining physician, Dr. Stephen Guertin, stated that the results of his

---

[41] US Const, Am VI.

[42] MCL 750.520b(1)(a).

[43] I refer to the complainant as D.W. to protect her identity.

[44] The Department of Social Services no longer exists. Its present equivalent is the Department of Human Services.

examination of D.W. were normal, although he could not rule out fondling. That year, a complaint from the Department of Social Services revealed that D.W. "made a statement alleging that she touched her [grandfather's] weenie when it got sick." Following the 1996 investigation, defendant attempted to enroll D.W. in counseling.

In 1998, D.W.'s mother abandoned her and moved to the West Coast. Defendant took care of D.W. In time, his girlfriend, Julie Sutliff, moved into his home. She observed D.W. touching herself in the vaginal area, making inappropriate sexual comments, and misbehaving. D.W. told Sutliff that touching herself was no big deal because her grandfather used to do it to her. She also told Sutliff that her grandfather used to molest her and that she would suck on his penis hard enough to "get medicine out of it." Sutliff said that she did not contact law enforcement personnel because defendant told her that he had attempted earlier to get help from them with no result.[45]

At a preliminary examination in 2002, D.W. alleged that defendant had abused her. Her accusations were very similar to those she had made against her grandfather. She asserted that defendant had "put his weenie in my mouth" and then "[it] got sick."

The prosecution presented no physical evidence of sexual abuse at trial. Defendant testified and maintained his innocence throughout the proceedings. D.W.'s testimony was the only direct evidence of molestation brought against him. The prosecution bolstered D.W.'s testimony by presenting evidence of her age-inappropriate knowledge of sexual matters and her continuous sexual behavior. The trial court prohibited defense counsel from cross-examining D.W. about her prior allegations of assault by her grandfather.

The prosecution's theory throughout trial was that D.W.'s abnormal behavioral problems and age-inappropriate sexual knowledge was a "cry for help" for someone to save her from defendant's molestation. In her opening statement, the prosecutor told the jury, "I don't have a smoking gun or DNA evidence, but I do have D.W. crying out for help," demonstrated by her "inappropriate sexual knowledge" and "inappropriate sexual behavior." The prosecution continued the theme of a cry for help by calling witnesses for the sole purpose of detailing D.W.'s erratic behavior.

The prosecution called an expert qualified in the area of pediatrics with an emphasis on sexual abuse, Dr. Guertin, who examined D.W. after the alleged abuse by defendant.[46] Dr. Guertin testified that his examination of D.W. showed no physical

---

[45] D.W.'s grandfather lived out-of-state when the 1996 investigation took place, which may explain why nothing ultimately came of the investigation.

[46] The jury was never permitted to hear that Dr. Guertin had examined D.W. four years earlier for signs of sexual abuse allegedly committed by her grandfather.

evidence of molestation, but, given D.W.'s "history," it was his opinion that she had likely been "fondled."[47] Significantly, Dr. Guertin never gave an opinion about who had fondled D.W. or what her "history" entailed.

The prosecution also called D.W.'s former elementary school teachers to testify about her disruptive behavior. The teachers recounted how D.W. was "a handful" at school. She would throw temper tantrums so severe that all the other students had to be removed from the classroom until she calmed down. Sometimes she hit her head against the floor and screamed "I want to die." She wrote letters to a boy in the class telling him she would have sex with him and "if you live with me I will have a baby."

Other students were reluctant to be in the same room with D.W. Once, D.W. gyrated against a desk in a "humping" motion like a "dog in heat." Another time, she took off her overalls and stood in the classroom in her underwear. One teacher recalled a time when D.W. screamed "don't fuck me" when the teacher tried to restrain her. In closing argument, the prosecution reminded the jury of D.W.'s behavior, claiming that D.W. was crying for help because of what was going on in her house. The prosecutor argued that, through her behavior, D.W. was yelling out "make this stop." The prosecutor systematically used D.W.'s behavior as proof that it was defendant who molested her.

### THE RAPE-SHIELD ACT VS THE CONSTITUTIONAL RIGHT OF CONFRONTATION

In limited situations, the admission of evidence of a victim's past sexual conduct may be not only relevant but required to preserve a defendant's constitutional right to confrontation.[48] The trial court must balance the legitimate competing interests of the state and the accused on a case-by-case basis.[49] The United States Supreme Court has identified specific factors that need to be considered: (1) the strength vel non of state interests weighing against admission of the evidence,[50] (2) the importance of the evidence to an effective defense,[51] and (3) the scope of the ban on the evidence.[52]

---

[47] When eliciting testimony, the prosecutor specifically instructed Dr. Guertin not to explain the "history" of abuse on which he based his opinion.

[48] *People v Hackett,* 421 Mich 338, 348 (1984).

[49] *Id. at* 349. *Hackett* instructs that the trial court should use the in camera hearing process to evaluate Confrontation Clause problems involving the rape-shield act's bar of normally relevant evidence. This process is found at MCL 750.520j(2); see also *Michigan v Lucas,* 500 US 145, 153 (1991).

[50] *Chambers v Mississippi,* 410 US 284, 295 (1973).

[51] *Davis v Alaska,* 415 US 308, 319 (1974).

In this case, the importance of the proposed evidence to an effective defense overwhelmed any state interest. Defendant was charged with two counts of first-degree criminal sexual conduct (CSC-I), a very serious crime.[53] A determination of his guilt hinged on whether the jury believed D.W. or him; it came down to a credibility contest between the two.

Beginning with her opening statement, the prosecutor used D.W.'s age-inappropriate knowledge and sexual behavior as proof that D.W. was telling the truth. Almost all the state's witnesses testified for the purpose of establishing D.W.'s abnormal behavior. By not allowing defendant to offer an alternative plausible explanation for D.W.'s behavior, he was left without a defense. By barring evidence that D.W. had been abused by her grandfather, the trial court kept from the jury a critical piece of the puzzle necessary for the jury to render a fair decision. There was no direct physical evidence tying defendant to the alleged assaults, and D.W. was inconsistent in describing the details of the alleged assaults. Yet, without an alternative explanation for D.W.'s age-inappropriate sexual knowledge and abnormal behavior, the jury was led directly to the conclusion that defendant was the one who committed the acts.

Furthermore, the evidence was pertinent and necessary to the defense because of the similarity between D.W.'s description of the alleged sexual abuse by defendant and her grandfather. D.W. testified at the preliminary examination that defendant "put his weenie in my mouth" and then "[i]t got sick." This language is nearly identical to the statements she allegedly made against her grandfather. The 1996 social services report indicated that D.W. said that she "touched her [grandfather's] weenie when it got sick." This is similar to D.W.'s telling defendant's girlfriend that her grandfather made her perform oral sex on him until "medicine" came out. It is extremely unlikely that both defendant and D.W.'s grandfather abused D.W. in the same manner and used the same peculiar language to describe the incidents.[54]

---

[52] *Delaware v Van Arsdall,* 475 US 673, 679 (1986). See *White v Coplan*, 399 F3d 18, 24 (CA 1, 2005) (listing factors to be considered); see also *Barbe v McBride,* 521 F3d 443, 458 (CA 4, 2008).

[53] CSC-I carries a maximum sentence of life in prison. MCL 750.520b(2).

[54] In his concurring statement, Justice Young appears to misunderstand the point I make here. I am not suggesting that D.W.'s behavior encouraged someone to sexually abuse her. Far from it. I am suggesting that D.W.'s description of the alleged abuse was first made before the dates on which defendant is alleged to have abused her. Hence, the abuser, if there was indeed one abuser, was not defendant, and the jury was never allowed to learn the facts that lead to that conclusion. Unless defendant abused D.W. in the same manner and using the same peculiar language as a prior abuser employed, D.W.'s age-

Moreover, the initial abuse had to have occurred before 1996. Because, by 1996, D.W. had already described acts of oral sex and a "weenie" getting "sick," with a liquid being ejaculated, which she referred to as "medicine." However, defendant was charged with abuse that allegedly occurred sometime between 1999 and 2000. At trial, D.W. could not remember the time of year, time of day, or day of the week of the first assault. Evidence that D.W. was molested before 1996 was relevant to show that D.W. may not have been abused in 1999 or 2000. If that is the case, defendant is innocent of the charges brought against him in this case.

Finally, the evidence of prior sexual abuse was essential to put Dr. Guertin's testimony in proper context. Dr. Guertin was the only expert in child sexual assaults to testify at trial. He stated that, on the basis of D.W.'s "history," she had likely been fondled. The evidence at trial suggested to the jury that the only person who might have fondled D.W. was defendant. Hence, it was essential for defendant to be able to show that the "history" on which Dr. Guertin based his conclusion included sexual abuse by another person. Without that knowledge, the jury was left with no viable explanation for Dr. Guertin's testimony that did not implicate defendant. Other courts reviewing applications of a rape-shield act have found a defendant's constitutional rights to have been impermissibly violated in similar circumstances.[55]

Defendant's guilt was a question of fact to be decided by an informed jury. If the jury had disbelieved D.W.'s testimony, the prosecution would have had no case. No other evidence linked defendant to the crimes. The jury was left without critical pieces of evidence to evaluate D.W.'s testimony, and this effectively rendered defendant defenseless. The trial court erred by refusing to allow defendant to develop evidence about the prior allegations of sexual abuse by D.W.'s grandfather. The error was not harmless beyond a reasonable doubt.

CONCLUSION

---

inappropriate sexual acting out could have been occasioned solely by abuse she suffered by someone other than defendant.

[55] See, e.g., *McBride,* 521 F3d 443 (concluding that the defendant had a constitutional right to introduce evidence of past sexual abuse of the child-victim to provide an alternative explanation for the child's psychological profile); *United States v Bear Stops,* 997 F2d 451, 457 (CA 8, 1993) (holding that the defendant's constitutional rights were violated when he was prohibited from introducing evidence that the six-year-old complainant had been sexually assaulted previously because the evidence "provide[d] an alternative explanation for the prosecution's persuasive evidence about [the victim's] behavioral manifestations of a sexually abused child").

There are limited situations where the rape-shield act is irreconcilable with a defendant's Sixth Amendment rights. In those situations, the statute must yield to a defendant's constitutional rights of confrontation and to a fair trial. When the rape-shield act and a defendant's rights of confrontation conflict, the trial court must balance the state's interest in protecting the victim against the importance of the evidence to the defense.

In this case, the trial court violated defendant's rights by barring all evidence that D.W.'s grandfather had previously sexually abused her. Defendant's defense was critically impaired when he was prevented from showing an equally plausible alternative explanation—that the child's grandfather had abused her in the past. Defendant is entitled to a new trial. Therefore, I dissent from the denial of leave to appeal.

MARKMAN, J. (*dissenting*).

I respectfully dissent and would reverse defendant's convictions and remand for a new trial. I believe that the trial court seriously erred in relying on the rape-shield statute to preclude defendant from introducing evidence concerning past sexual abuse of the complainant. As a result, the jury was presented with an incomplete and distorted picture of what had occurred, the truth-seeking process of the criminal justice system was compromised, and defendant, in my judgment, was denied a fair trial. By denying leave to appeal, this Court upholds defendant's convictions while depriving him of substantial relevant evidence with which to defend himself.

## I. History

A jury convicted defendant of two counts of first-degree criminal sexual conduct (CSC-1) pursuant to MCL 750.520b(1)(a)(sexual penetration with a person under 13 years of age). The charges arose out of two alleged incidents with defendant's stepdaughter, complainant DW. On the first day of trial, the prosecutor requested a ruling by the court to prohibit defense questioning regarding any previous allegations made by DW of sexual abuse.[56] The trial court determined that such testimony would be contrary to the rape-shield statute and ruled that defendant could not elicit such testimony.

During trial, DW testified that defendant performed certain acts with her. She described sexual acts that a child of her age — nine years old — typically would not have knowledge of or be able to describe. Despite this testimony, defendant was prohibited from introducing evidence that DW could have learned about such acts not only from DW's alleged abuse, but also from the abuse alleged against her step-grandfather. Dr. Stephen Guertin, the medical doctor who examined DW after her allegations against her

---

[56] Prior to her allegations against defendant, DW had alleged that her step-grandfather sexually abused her.

step-grandfather, and also after her allegations against defendant, testified that DW's history led him to believe that she had been abused. Defendant, however, was again not allowed to explore DW's past allegations and how the conduct that was the subject of these allegations might have affected Dr. Guertin's opinion.

The jury subsequently convicted defendant on both counts of CSC-1, and the Court of Appeals affirmed. *People v Parks*, unpublished opinion per curiam of the Court of Appeals, issued May 18, 2004 (Docket No. 244553). We held defendant's application for leave to appeal in abeyance, pending our decision in *People v Jackson*, 477 Mich 1019 (2007). In *Jackson* we held that "testimony concerning prior false allegations does not implicate the rape-shield statute." *Id.* We remanded this case to the trial court to afford "the defendant the opportunity to offer proof that the complainant made a prior false accusation of sexual abuse against another person." 478 Mich 910 (2007).

The trial court held an evidentiary hearing in accordance with our remand order. The testimony provided a glimpse of DW's life leading up to the present allegations against defendant. DW spent the first four years of her life living with her mother, Terry, and her grandmother and step-grandfather in Missouri. During that time, when DW was around three years old, she fell off a golf cart and suffered a closed-head injury. The injury has affected DW's development, and she still receives medical treatment, including drug treatment, in order to limit seizures caused by the injury.

In 1995, when DW was four years old, Terry, who was then pregnant, moved with DW to Michigan, where they met defendant, who began living with them. Terry and defendant married and had a child of their own. During this period, DW began acting out in various sexual ways, all of which were inappropriate for a child of her age. When asked why she was behaving in such a manner, DW described certain occasions on which her step-grandfather had allegedly abused her.[57]

Terry and defendant sought help in connection with DW's allegations against her step-grandfather, including contacting the Family Independence Agency (FIA). During DW's interview with the FIA, she did not disclose any past abuse by her step-grandfather. The FIA, however, referred DW to Dr. Guertin for an examination.

In 1996, Dr. Guertin examined DW with respect to the allegations about her step-grandfather, but he did not find any physical manifestation of the molestation. DW also did not disclose to Dr. Guertin abuse by her step-grandfather. Defendant and Terry were unable to pursue the allegations any further.

---

[57] DW told defendant that her step-grandfather had touched her vagina and put his penis in her mouth. The language DW used in relating this abuse is similar to the language she used to describe the alleged acts by defendant and demonstrated sexual knowledge clearly inappropriate for a four- to five-year-old child.

In 1998, Terry left with her three children, including DW. Shortly thereafter, defendant received a call from a police officer in Oregon, inquiring about the children. Terry had apparently been charged with drug offenses, and the children were at risk of being placed in foster care. Defendant arranged for the children to come live with him, which they did in early 1999. Around that same time, defendant began living with Julie Sutliff. Sutliff testified at the evidentiary hearing that DW exhibited sexually inappropriate behavior, and when Sutliff asked DW about her behavior, DW told Sutliff about the incidents with her step-grandfather.

The trial court determined that DW's past allegations of abuse by her step-grandfather were *not* "false" and thus remained within the scope of the rape-shield statute. Defendant again sought leave to appeal in this Court, and we heard oral argument regarding, among other things, whether DW's allegations against her step-grandfather are inadmissible on the basis of the rape-shield statute. 481 Mich 860.

## II. Rape-Shield Statute
The rape-shield statute, MCL 750.520j, reads in part:

> (1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections [MCL 750.520b to 750.520g] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
>
> > (a) Evidence of the victim's past sexual conduct with the actor.
>
> > (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

This statute only excludes evidence of the "victim's sexual conduct." Thus, any inquiry into the statute's application must focus on the meaning of "conduct." The ordinary meaning of "conduct" is harmonious with the Legislature's use of "conduct" throughout the enacting legislation, 1974 PA 266,[58] and with the Legislature's purposes in enacting the rape-shield statute. Each of these interpretative guides strongly suggests that "conduct" refers only to *volitional* actions by the victim and does not encompass *involuntary* acts such as those that stem from being subjected to sexual abuse.

The definition of "conduct" varies little from dictionary to dictionary. Conduct is defined as: "personal behavior; way of acting; deportment," *Random House Webster's*

---

[58] This amended the criminal code with comprehensive legislation covering criminal sexual conduct (CSC). MCL 750.520a *et seq*.

*College Dictionary* (1997); "[t]he way a person acts; behavior," *The American Heritage Dictionary of the English Language* (1981); and "[t]he manner of guiding or carrying one's self; personal deportment; mode of action; behavior," *Webster's Revised Unabridged Dictionary* (1996). The common theme of these definitions is that "conduct" pertains to an individual's own behavior, to actions initiated or set in motion *by* the individual. Being the *victim* of, or having been *subjected* to, sexual abuse by *another* does not by this definition of "conduct" constitute something within the scope of the rape-shield statute, and therefore should not be excluded from evidence under the authority of this statute.

This interpretation of "conduct" is further supported by the Legislature's use of "conduct" throughout the rape-shield statute. If "conduct" is read to include abuse perpetrated *against* the victim by *other* persons, then references in the statute, MCL 750.520j(1), to "opinion evidence of the victim's sexual conduct" and "reputation evidence of the victim's sexual conduct" make no sense. Reputation and opinion evidence are typically based on a person's character, such as the person's tendency for aggression.[59] A person's character and conduct are similar at least in the sense that they are each formed by voluntary decisions made by that individual. Actions concerning which an individual has no control cannot be said to establish a person's character, so when the Legislature extended protection from reputation and opinion evidence in MCL 750.520j(1), it likely understood that such evidence could only apply with respect to a victim's sexual history over which the victim has control. Thus, the ordinary volitional understanding of "conduct" also fits within the context in which it is used in the rape-shield statute, whereas a broader definition, encompassing non-volitional behavior, including sexual abuse by others, does not.

The statute provides additional insight on the meaning of "conduct" by distinguishing "conduct" from "activity" in paragraphs (a) and (b) of MCL 750.520j(1). These paragraphs set forth two exceptions to the general inadmissibility of evidence regarding a "victim's sexual conduct" in subsection (1). Paragraph (a) renders admissible evidence of the "victim's past sexual *conduct* with the actor," and paragraph (b) renders admissible "specific instances of sexual *activity*" concerning the "source or origin of semen, pregnancy, or disease." "Activity" does not connote the concept of volition to the same extent as "conduct." "Activity" in paragraph (b) pertains to conditions that directly result from the physical sex act itself — semen, pregnancy, disease — in which the concept of volition is essentially irrelevant. In contrast, "conduct" in paragraph (a) pertains to a range of interpersonal behavior that extends beyond the physical act itself, and in which the concept of volition may be quite relevant in assessing whether the victim chose to behave in such a way that the defendant should be deemed less culpable,

---

[59] This Court recognized that "sexual reputation," when presented to show that the victim consented, is "simply a variation of character evidence." *People v Hackett*, 421 Mich 338, 348 (1985).

or not culpable at all, for the alleged offense. Interpreting "conduct" to include non-volitional action blurs the Legislature's apparently careful distinction between "conduct" and "activity."

The Legislature's use of "conduct" throughout 1974 PA 266 further supports interpreting "conduct" to include only volitional actions. See, e.g., MCL 750.520b (describing first-degree criminal sexual "conduct"). It seems unlikely that the Legislature intended to punish non-volitional activity under the criminal code. Interpreting "conduct" to mean only volitional action maintains this understanding. "Identical language should receive identical construction when found in the same act." *People ex rel Simmons v Munising Twp*, 213 Mich 629, 633 (1921).

Further uses of "conduct" in 1974 PA 266 are found in MCL 750.520a, in which the Legislature defined "actor" as "a person accused of criminal sexual conduct," MCL 750.520a(a), and "victim" as "the person alleging to have been subjected to criminal sexual conduct," MCL 750.520a(s). These definitions distinguish a person who has *chosen* to perform a certain act from one who had *no* choice in performing such act. If a victim, for example, is raped by an actor, the rape is considered to be the *actor's* conduct. The victim is considered to have been "*subjected to*" the conduct, strongly suggesting that rape is not fairly characterized as the *victim's* conduct.[60] Rather, it would only be the "conduct" of the person who *chose* to perform the act.[61]

The overall purpose of the rape-shield statute also supports understanding "conduct" by its normal definition to encompass only volitional activity. MCL 750.520j was clearly enacted to prevent the introduction of embarrassing evidence regarding the victim's sexual history at trial.[62] Such prohibition, it was hoped, would increase the

---

[60] I disagree with the concurring justice who states that a victim "take[s] part in" the sexual abuse to which he or she is subjected. *Ante* at 6. A person who is forced to endure such abuse, or may not even be aware of it (e.g., where the victim is sleeping or unconscious), cannot in normal parlance be said to have "take[n] part in" such act.

[61] Still further support is provided by the Legislature's definitions of "mentally incapable" and "mentally incapacitated" in MCL 750.520a. The definitions refer to mental illness and altering substances that "render[] [a person] incapable of appraising the nature of his or her conduct." MCL 750.520a(i); see MCL 750.520a(j) (using language only slightly different from MCL 750.520a[i]). Here, "conduct" also retains its essence that an activity be volitional, because the gist of the definitions is that the person can no longer control his or her actions because of mental illness or the influence of drugs.

[62] This Court has observed that MCL 750.520j(1) was enacted to encourage victims to report sexual assaults by reducing a complainant's fear that "the trial proceedings would veer from an impartial examination of the accused's conduct on the date in question and instead take on aspects of an inquisition in which complainant would be required to

likelihood that sexual assault victims would report such assaults and not be deterred from doing so by the prospect of embarrassment. Yet, reading the rape-shield statute to exclude evidence regarding past *abuse* suffered by the victim bears no apparent relationship to this purpose. While any person may well be uncomfortable about revealing past instances in which he or she was sexually abused, such uneasiness is sharply distinct from the kind of embarrassment that rape-shield statutes were designed to foreclose — embarrassment caused as a function of one's *own* misbehavior or questionable conduct.[63]

By enacting the rape-shield statute, the Legislature also sought to eliminate the potential for a defendant to exploit a victim's sexual history to imply consent in the defendant's case.[64] What is at issue in this case — the admissibility of evidence that the victim was previously abused by a person *other* than the defendant — cannot be similarly exploited by the defendant.

### III. "Sexual Conduct"

With the understanding that the rape-shield statute only applies to volitional acts, evidence regarding DW's allegations against her step-grandfather does not qualify for exclusion as "the *victim's* past sexual conduct." The testimony at the evidentiary hearing indicates that DW's step-grandfather may have "subjected" her to various sexual acts, none of which DW chose to perform. Accordingly, defendant should have been allowed to present evidence regarding this past sexual abuse.[65]

Because of the trial court's erroneous interpretation of the rape-shield statute, rather than the jury basing its decision regarding defendant's guilt on *all* the relevant information, the jury was forced to make assumptions based on incomplete information. In particular, in order to confront the unsettling fact that DW was able at nine years of age to describe certain sex acts she alleged defendant had performed on her, the jury was more likely to conclude that defendant actually *had* performed those acts. The jury was

---

acknowledge and justify her sexual past." *People v Arenda*, 416 Mich 1, 9 (1982), quoting *People v Khan*, 80 Mich App 605, 614 (1978) (quotation marks and citation omitted).

[63] See, e.g., *In re Michael*, 119 Ohio App 3d 112, 121 (1997) ("Although evidence of [the male victim's] prior sexual abuse would intrude on an intimate detail of his personal life, such intrusion was not to harass, degrade, or embarrass him, or to generally attack his credibility by implying that he was immoral or unchaste.").

[64] See *Hackett*, *supra* at 353-354 (affirming the trial court's decision to prohibit the defendant from trying to establish a victim's consent by introducing a previous instance in which she had met a man at a bar and left with him for consensual relations).

[65] As a result, it is unnecessary to address defendant's constitutional argument regarding his Sixth Amendment right to confrontation.

not allowed to hear and evaluate an alternative explanation that DW may have learned about such acts not from defendant, but from her step-grandfather. If the jury had been apprised of DW's allegations of previous abuse, it may well have come up with a different explanation concerning the source of DW's precocious sexual knowledge and thereby reached a different conclusion regarding defendant's guilt.[66]

Equally troubling is the void left by Dr. Guertin's testimony. Dr. Guertin testified that he had examined DW in 1996, but the jury received no information regarding what prompted that examination. Instead, Dr. Guertin testified that during his most recent examination of DW, *which followed in time the present allegations against defendant*, he discerned no physical signs of abuse but concluded on the basis of DW's history that she had been sexually abused.[67] The trial court then instructed the jury not to consider the 1996 examination as relevant to the instant charges. As a result, the jury heard that DW had likely suffered abuse and was aware of only one possible source of that abuse — defendant. Thus, by improperly expanding the purview of the rape-shield statute, the trial court left the jury with a distorted picture of defendant's potential role in previously abusing DW. Defendant had no way of presenting evidence that DW's history potentially included abuse by another individual. The court's limitation on Dr. Guertin's testimony unfairly subjected defendant to a process in which the jury heard evidence suggesting his guilt, but did not hear any testimony by defendant with which he could dispel this suggestion.

## IV. Response to Concurrence

(1)  The concurring justice asserts that the interpretation of MCL 750.520j set forth in this dissent would "give rape victims fewer privacy interests than prostitutes under the rape-shield statute." *Ante* at 1. Although an attention-getting observation, I fail to see how this is either relevant or true. The rape-shield statute bars evidence of volitional sexual behavior, regardless of whether the complainant is a prostitute, a rape victim, or any other person, whatever the complainant's gender, profession, race, color,

---

[66] See, e.g., Buttrey, *Michigan's rape-shield statute and the admissibility of evidence that a child complainant has been previously molested*, 15 TM Cooley L R 391, 391-393 (1998) (questioning the logic of allowing a jury to assume that the defendant is the sole source of a complainant's sexual knowledge where evidence indicates additional sources).

[67] The following is the relevant exchange between the prosecutor and Dr. Guertin:

> *Q*: Okay. And without going into what history it is that she gave or what allegations she made, if you will, what was your finding?

> *A*: The child gave a history. The history was significant in my opinion. The examination was normal. The examination based on her history would be expected to be normal, and it was my impression based on the contents of the history that she likely had been fondled.

creed, lifestyle, or history of sexual promiscuity. Evidence of volitional sexual behavior is barred with regard to *all* complainants. Similarly, *all* complainants are treated exactly the same with regard to non-volitional sexual behavior.

(2) The concurring justice states that defendant's "failure to preserve the appropriate claim of error is, by itself, a sufficient — and [his] primary — basis for denial." *Ante* at 4. Yet, defendant did preserve his claim of error by arguing before the trial court that DW's allegations should not be precluded by the statute. In any event, as the concurring justice himself has stated, "addressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle." *Mack v Detroit*, 467 Mich 186, 207 (2002) (Young, J.). A majority of this Court has *already* held that defendant's claim of error warranted a hearing by the trial court regarding the falsity of DW's allegations. Now that the trial court has determined that the allegations were not false, *the* controlling issue is whether the preclusion of evidence was proper in that it constituted the victim's "sexual conduct." Where a defendant's guilt, and resultant exposure to a sentence of imprisonment for life, potentially rests entirely upon the interpretation of a statute, I believe this Court should "set forth the law as clearly as it can, irrespective of whether the parties assist the Court in fulfilling its constitutional function." *Id.* at 209.

(3) The concurring justice also contends that my "understanding of the term 'conduct' artificially restricts the term to voluntary behavior." *Ante* at 6. I fail to see how using an ordinary definition of an ordinary term injects anything "artificial" into the interpretative process. The beginning point of statutory interpretation is to understand what the Legislature intended by its use of a word in context. Indeed, the concurring justice seems to agree with such an approach when *he* concludes that the "longstanding definition" of "conduct" is "personal behavior." *Ante* at 6 n 14. Yet, he never addresses what *this* definition means in the context of the victim's "sexual conduct." Instead, he concludes that "conduct" can encompass "*both* voluntary behavior *and* involuntary behavior," *ante* at 6, and, to support this conclusion, relies on a single, stray reference to "conduct" set forth in a decision predating the rape-shield statute by 54 years, having nothing to do with the meaning of "conduct," and relating in not the slightest way to rape or sexual behavior of any kind. *Ante* at 6 n 15. Quite apart from the fact that it is "conduct," not "personal behavior," that is the subject of interpretation here, the concurring justice's invocation of "personal behavior" in support of his position disregards that this latter term *also* describes the manner in which a person acts *under his or her own will*. For example, if asked to describe a person's "driving behavior," or more specifically his or her "personal driving behavior," a response might typically reference how fast that person chooses to drive or how that person interacts with other drivers on the road. On the other hand, "personal driving behavior" would not typically refer to a person having been rear-ended at a stop light or having been cut off by another driver. Similarly, a person's "personal sexual behavior" might typically refer to that person's promiscuity or lack thereof, or to his or her sexual preferences or inclinations. It would

not, however, typically refer to instances of sexual abuse against that person in which he or she had no control.

(4)    The concurring justice argues that, although the initial bill included the phrase "consensual sexual activity," the bill actually enacted included an amendment "that *deleted* the word 'consensual.'" *Ante* at 7. This argument fails to recognize that the amendment, in fact, replaced "consensual sexual activity" with "sexual conduct," rather than merely deleting the word "consensual." If anything, this amendment suggests that the Legislature considered "conduct" to be an altogether *suitable* substitute for "consensual activity."

(5)    The concurring justice's citation of *People v Arenda*, 416 Mich 1 (1982), has little bearing on the present issue because the defendant in that case did not raise any argument regarding the meaning of "conduct," and the Court did not address this issue at all. *Ante* at 8. Instead, *Arenda* focused exclusively on the *constitutionality* of the rape-shield statute and never explored the meaning of a victim's "sexual conduct."

(6)    The concurring justice would require the defendant to demonstrate that "another person was convicted of criminal sexual conduct (CSC) involving the complainant" before being allowed to reference DW's past allegations. *Ante* at 13, citing *People v Morse*, 231 Mich App 424 (1998). Again, I disagree. First, *Morse* only applies to "conduct" barred by the rape-shield statute and DW's prior allegations do not constitute "conduct." Second, the jury was allowed to hear Dr. Guertin's testimony, which was influenced by DW's prior allegations, even though her step-grandfather was never convicted of CSC. Defendant was denied an opportunity to explore those same allegations. Requiring defendant to first show that a CSC conviction arose out of the allegations would subject defendant to a burden *higher* than that of the prosecutor as a precondition to presenting evidence to the jury.

(7)    Finally, the concurring justice states that the Legislature "has determined that the fact that a complainant had been abused in the past is simply irrelevant to her present credibility." *Ante* at 11. Here, however, it is not the *abuse*, but the *allegations* of such abuse, that go to DW's credibility because she testified at the preliminary hearing that she never made any previous allegations. Further, although the concurring justice acknowledges that such past allegations *may* be important in "explaining D.W.'s age-

inappropriate sexual knowledge and behavior," *ante* at 11, he overlooks the importance of these allegations in also explaining Dr. Guertin's testimony. Dr. Guertin told the jury that he had concluded, based on DW's history, that DW had likely been abused. The jury, however, had no way of knowing that DW's "history" included allegations of past abuse and that these *allegations*, rather than any *conduct* by defendant, may have contributed to Dr. Guertin's conclusion.[68] Allowing defendant to be convicted with such incomplete information seriously affects the integrity of the trial process and compromises its truth-seeking mission.

## V. Conclusion

For these reasons, I would remand for a new trial. Defendant should be allowed the opportunity to present evidence regarding DW's allegations against her step-grandfather and their relevance to the charges against defendant.

CAVANAGH, J., joins the statement of MARKMAN, J.

---

[68] The concurring justice suggests that defendant could have defended against the jury's incomplete knowledge of DW's history by questioning Dr. Guertin about the "causal relationship between [his] conclusion and the abuse that defendant was charged with committing." *Ante* at 13 n 40. Such questioning, of course, would still have left the jury in the dark about any *alternative source* of abuse and, even more problematically, the jury may well have assumed, to the *further* detriment of defendant, that DW's history included *additional* abuse *by defendant* for which he had *previously* been charged.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 5, 2009

_Corbin R. Davis_
Clerk