**Danny MONTGOMERY, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2007–SC–000852–MR.

Supreme Court of Kentucky.

March 18, 2010.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Jason Bradley Moore, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Danny Montgomery appeals as a matter of right from a Judgment of the Trimble Circuit Court convicting him of first-degree sexual abuse, in violation of KRS 510.110, and sentencing him as a first-degree persistent felony offender (PFO) to twenty years in prison. The Commonwealth alleged that on five occasions Montgomery raped his early-adolescent stepdaughter, K.B., and that shortly prior to one of the rapes he abused her by placing his hand on her vagina. The jury acquitted Montgomery of the rape charges, but convicted him of sexual abuse. Montgomery challenges his conviction on three grounds. He maintains (1) that the rape and abuse charges should have been tried separately; (2) that the trial court erred by admitting

evidence pursuant to KRE 404(b) that Montgomery had similarly abused three other young girls; and (3) that the trial court erred by excluding evidence tending to show that K.B. had knowledge which enabled her to make sexual allegations and that she had a motive to falsely accuse him. Montgomery also challenges his sentence. He contends that the trial court improperly gave the Commonwealth an opportunity to perfect its PFO proof, that crucial portions of the Commonwealth's evidence were incompetent, and that the court incorrectly instructed the jury to recommend an enhanced sentence on the PFO charge without first recommending a sentence for the underlying sexual abuse. Convinced that Montgomery has not established grounds for relief, we affirm both his conviction and his sentence.

### RELEVANT FACTS

In October 2005, a Trimble County Grand Jury indicted Montgomery for allegedly having raped K.B. ten times between December 2, 2004 and August 18, 2005, when K.B. was thirteen and fourteen years old. The ten counts of the indictment were identical. In response to Montgomery's motion for a bill of particulars, the Commonwealth, in October 2006, detailed five rapes: one on December 1, 2004, a day after Montgomery, K.B., and K.B.'s mother had arranged to move to Trimble County from Johnson County, Indiana; a second in January 2005; a third in March 2005; a fourth later that spring, and a fifth during the morning of May 20, 2005, following an incident the night before when Montgomery allegedly awakened K.B. by reaching inside her pants and fondling her vagina. All of these incidents were alleged to have occurred at Montgomery's Trimble County residence. The other five counts of rape were dismissed, but the May 2005 fondling allegation gave

rise in November 2006 to a separate indictment for sexual abuse. The rape and abuse charges were ultimately joined and tried together with a first-degree persistent felony offender charge in July 2007.

Trial testimony established that K.B. was born in California in May 1991. She has two older half siblings, a brother and a sister. In 2000, the family moved from California to Indiana, where K.B.'s mother soon met, commenced living with, and eventually married Montgomery. Almost as soon as Montgomery moved in, the elder sister accused him of molesting her. The accusations were not pursued, but the sister was allowed to return to California to live with her father. At some point, too, the brother left the home to live with relatives. In 2002, when K.B. was eleven, she told a friend and then a school counselor that Montgomery had "raped" her. The counselor informed K.B.'s mother, who immediately took K.B. to the emergency room to be examined. The exam revealed that K.B.'s hymen was still intact and that otherwise her genitals were completely normal. Soon thereafter K.B. told the investigating social worker that she had made up the "rape" allegation and that in fact nothing had happened.

Allegations against Montgomery arose again in November 2004, when K.B. was thirteen years old and still living in Indiana with her mother and Montgomery. The mother of one of K.B.'s classmates reported to authorities a rumor that Montgomery had molested some of K.B.'s friends and had subjected K.B. to intercourse. A police officer and a social worker promptly interviewed the girls at school. Three of K.B.'s friends reported that they had, at separate times, spent the night at K.B.'s home and that during the night they had been awakened by Montgomery reaching into their pants and touching their vaginal areas. When initially questioned,

K.B., too, made allegations against Montgomery.

It was in the wake of the investigation of these allegations that Montgomery, K.B., and K.B.'s mother moved from Indiana to Trimble County. K.B. testified that she and Montgomery spent December 1, 2004 at their new trailer painting and preparing to move in. That night, she claimed, Montgomery forcibly subjected her to intercourse. She admitted, however, that the next day, when she was again interviewed by the Indiana police officer investigating the allegations against Montgomery there, she not only did not report the alleged rape but, recanting her allegations of a few days before, denied that Montgomery had abused her in Indiana.

K.B. also testified concerning the four other alleged rapes and the May 19 incident of abuse. In addition, her testimony and that of others described how, on May 20, 2005, the day of the last alleged rape, K.B.'s brother moved from his grandparents' home in Indiana to his mother's and Montgomery's Trimble County trailer. About a week after his arrival, he allegedly found a letter the then fourteen year old K.B. had written to herself but addressed to her mother, in which she described Montgomery's alleged assaults and sought her mother's protection. The brother showed the letter to his mother, and when she confronted Montgomery a melee erupted that soon involved the police and resulted in an emergency protective order barring Montgomery from the home. A few days later, however, K.B. again told one of the investigating officers that she had fabricated her allegations. K.B. was on probation for a burglary at the time, and the investigating officers testified that she claimed to have made up the allegations against Montgomery in an attempt to divert attention from herself.

Following the May altercation, Montgomery and K.B.'s mother separated and by the time of Montgomery's trial they had divorced. Once they had separated, apparently, that is where matters stood until the following August. In August 2005, however, another of K.B.'s Indiana friends, who is also Montgomery's great niece, accused K.B. of molesting her. The officer who investigated that charge was the same officer who had investigated the Indiana charges against Montgomery by the three friends who had slept overnight at K.B.'s residence. In the course of his interview with K.B., the officer again asked about those earlier accusations. This time K.B. reported that Montgomery had in fact abused her in Indiana, and she renewed her allegations of rape in Kentucky as well. Those allegations were again referred to Kentucky authorities and provided the basis for Montgomery's October 2005 indictment.

### ANALYSIS

**I. Evidence That Montgomery Had Similarly Abused Three Other Young Girls was Properly Admissible As to the Sexual Abuse Charge Under the Modus Operandi Exception to KRE 404(b)**

■ The Commonwealth indicated prior to trial that it would offer the testimonies of three girls from Indiana, each of whom, on separate occasions, had been an overnight guest in the residence occupied by K.B. and Montgomery. Each girl would testify that while she was sleeping in a room with at least one other girl, Montgomery had awakened her by reaching into her pants and that as soon as she awoke he had desisted, without comment or further touching, and left the room. The sexual abuse charge in the November 2006 indictment involved virtually identical conduct. The trial court, after a hearing,

denied Montgomery's motion in limine to exclude this evidence, finding it a "strikingly similar ... method of sexual abuse."

■ Montgomery argues that this evidence was not admissible and that his abuse conviction must therefore be reversed. He correctly notes that under KRE 404(b) evidence of other crimes or bad acts is not admissible as proof of character "in order to show action in conformity therewith." Other-crimes evidence may be admissible for other purposes, however, such as proof of motive, opportunity, intent and plan. KRE 404(b)(1). In particular, this Court has upheld the admission of evidence of prior sexual misconduct as proof of the *corpus delicti* in sex offense cases where the prior misconduct is sufficiently similar to the charged offense to indicate that both acts were committed by the same person. *Dickerson v. Commonwealth,* 174 S.W.3d 451, 467–70 (Ky.2005) (discussing the sufficient commonality necessary to establish a "signature crime"). In *Clark v. Commonwealth,* 223 S.W.3d 90 (Ky.2007), we recently emphasized the narrowness of this "modus operandi" exception to KRE 404(b)'s general rule of exclusion by recognizing

> the fundamental principle that conduct that serves to satisfy the statutory elements of an offense will not suffice to meet the modus operandi exception. Instead, the modus operandi exception is met only if the conduct that meets the statutory elements evidences such a distinctive pattern as to rise to the level of a signature crime.

1. Appellate counsel has argued that, unlike the Indiana girls, K.B.'s description of the event did not include a reference to Montgomery placing his hand "in her pants." To support this point, counsel cites the Bill of Particulars which makes no reference to

*Id.* at 98. The trial court's decision regarding KRE 404(b) matters is reviewed by this Court under an abuse of discretion standard, *i.e.,* was it "arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Id.* at 95.

Here K.B. testified that while she and an overnight guest were sleeping in her family's computer room, she was roused by something touching her and woke to find Montgomery reaching under her clothes and placing his hand on her vagina.[1] When she stirred, Montgomery removed his hand and without saying anything or touching her in any other way left the room. K.B.'s friends all likewise testified that while sleeping over at K.B.'s house they were awakened by Montgomery reaching his hand into their pants and placing his hand on or near their vaginas. As soon as they awoke and moved away, he desisted and without saying anything either he left or, in one instance, allowed the victim to leave the room.

Under *Clark,* the mere facts that Montgomery touched or attempted to touch the girls' genitals and that the girls were all roughly the same age—twelve or thirteen—would not justify invoking the modus operandi exception. However, the additional facts that Montgomery had access to all of the alleged victims in his home, that he assaulted each of them in the same manner while they were asleep with another girl or girls sleeping nearby, and that in each case when the victim awoke he silently withdrew establish a pattern of conduct distinctive enough to be deemed a modus operandi. The trial court acknowledged these various similarities and the only difference proffered by Montgomery (K.B.

K.B.'s clothing. While how victims are clothed should not undermine a modus operandi finding, we note that K.B., in fact, testified that Montgomery placed his hand under her clothing.

was his stepdaughter while the other three girls were not related to him) before ruling the evidence admissible. On appeal Montgomery continues to emphasize his different status as to the three Indiana girls but, like the trial court, we deem that insufficient to undermine a finding of modus operandi. In *Clark*, we noted that the defendant was in a priest/counselor role as to the child-witness while he was simply a family friend to the two child-victims and this resulted in different reasons and locations for his contact with the three children, who testified to abuse "in many different places, such as schools, bedrooms, bathrooms, living rooms, and vehicles." *Id.* at 99. By contrast, Montgomery had nighttime contact with K.B. because she was his stepdaughter and lived in his home. Similarly, he had nighttime contact with the three Indiana girls because K.B. was his stepdaughter, she lived in his home and the girls were K.B.'s overnight guests. In short, the trial court correctly found a distinctive pattern of conduct and did not abuse its discretion, at least with respect to the sex abuse charge, by admitting the evidence under the modus operandi exception to KRE 404(b).

## II. The Consolidation Of The Sex Abuse Indictment With The Rape Indictment for Trial Does Not Entitle Montgomery To Relief.

### A. Montgomery Was Not Prejudiced By The Alleged Misjoinder Of His Rape And Abuse Charges.

■ Montgomery next contends that the rape and abuse indictments should have been tried separately. Under RCr 9.12, of course, two indictments may be tried jointly if the offenses could have been joined in a single indictment, and under RCr 6.18 joinder in a single indictment is appropriate if the offenses "are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." These rules must be applied in conjunction with RCr 9.16 which requires separate trials if joinder of offenses would result in prejudice to either party.

In this case, the joinder consisted of six sexual offenses against the same minor victim in the same residence over a five and one-half month period. The sexual abuse charge was based on nighttime conduct that occurred a few hours prior to the last alleged rape on the morning of May 20. These charges can certainly be deemed "connected" or "parts of a common scheme or plan." Nevertheless, Montgomery claims he was prejudiced by the joinder citing cases such as *Rearick v. Commonwealth*, 858 S.W.2d 185, 187 (Ky. 1993) wherein we stated: "A significant factor in identifying such prejudice is the extent to which evidence of one offense would be admissible in a trial of the other offense." Significantly, *Rearick* and the other cases cited by Montgomery where joinder was improper involved the trial of the same or similar offenses perpetrated against different victims. *See, e.g. Romans v. Commonwealth*, 547 S.W.2d 128 (Ky.1977) (rape charges as to two different women). Cases involving similar offenses against multiple victims present different considerations not applicable here.

Montgomery correctly notes, however, that the evidence that he allegedly molested the three girls in Indiana would not have been admissible under KRE 404(b) in a separate trial of the five rape charges. He then posits that unless the Commonwealth was willing to forego using that evidence altogether K.B.'s abuse and rape allegations should have been severed. Even assuming the trial court abused its discretion by joining those offenses, Montgomery is not entitled to relief unless he

was prejudiced by the improper joinder. *Jackson v. Commonwealth,* 20 S.W.3d 906 (Ky.2000). The joinder clearly did not prejudice him with respect to the rape charges because he was acquitted of those five offenses. As to the sexual abuse charge of which he was convicted, the KRE 404(b) evidence on which he premises his misjoinder argument was properly admissible as to that charge.

■ Finally, Montgomery argues that the joinder prejudiced him because it may have led the jury to reach a compromise verdict. Specifically, he questions why the jury would "believe sex abuse if they disbelieved the rapes?" He posits that the jury compromised a verdict to "hedge their bet that he didn't commit the rapes." As the Commonwealth correctly notes, however, the prejudice required for relief under RCr 9.16 must appear more clearly than as a matter of mere speculation, *Jackson v. Commonwealth, supra,* and here Montgomery can only speculate about the jury's reasoning. One obvious distinction is that K.B.'s elder sister (whose testimony has not been challenged on appeal) and the three Indiana girls also testified to sexual abuse by Montgomery.

**B. The Sex Abuse Indictment Does Not Give Rise To A Presumption Of Vindictiveness.**

■ Montgomery also argues that the Commonwealth sought the sex abuse indictment "vindictively" in retaliation for Montgomery's motion to exclude the collateral sex abuse evidence regarding the three girls from Indiana. He relies on *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), in which the United States Supreme Court ruled that a prosecutor violated the due process rights of a defendant who exercised his right to appeal a misdemeanor conviction when the prosecutor obtained a new felony indictment based on the same conduct while the misdemeanor appeal was still pending. In those post-conviction circumstances, the Court explained, the prosecutor's act could reasonably be presumed to have the impermissible intent of discouraging an appeal.

In *United States v. Goodwin,* 457 U.S. 368, 382, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), however, the Court rejected any presumption of vindictiveness in the pretrial setting, where "[a] prosecutor should remain free . . . to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." The Court noted that prior to trial defendants routinely invoke procedural rights that impose some burden on the prosecutor, as Montgomery did in this case by moving to exclude the collateral sex-abuse evidence. But "[i]t is unrealistic," the *Goodwin* Court explained, "to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates." *Id.* at 381, 102 S.Ct. 2485. Indeed, in *Dickerson v. Commonwealth,* 278 S.W.3d 145 (Ky.2009), we recently held that the addition of new charges to address an evidentiary problem following remand from this Court did not support a presumption of vindictiveness. The suggestion of vindictiveness is even less supportable in the pre-trial setting, where the Commonwealth is adjusting its case to developing facts and must remain free to respond to defense motions in ways that protect "the societal interest in prosecution." *Goodwin, supra.* This distinction is especially well-taken where, as here, the issue was not preserved by objection at trial. Notably, Montgomery does not contend that he was not legitimately subject to the sex abuse charge, and the Commonwealth's decision to add it in light of how

the case was developing most assuredly does not raise a palpable error subject to relief under RCr 10.26. *Commonwealth v. Jones,* 283 S.W.3d 665 (Ky.2009) (noting that palpable error relief is available only for errors appearing plainly on the record). It may well be that the Commonwealth sought the ninth-hour sex abuse indictment strategically, in hopes of bootstrapping the collateral sex abuse evidence into Montgomery's rape trial, but, as noted, such a strategy does not imply vindictiveness, and certainly not such apparent vindictiveness as to justify palpable error relief.

In sum, although the trial court may have abused its discretion by joining the rape and abuse offenses where joinder entailed the introduction of collateral acts of sexual abuse at Montgomery's rape trial, the misjoinder, if any, did not result in prejudice. Consequently, Montgomery is not entitled to relief from his sex abuse conviction on this ground.

### III. The Trial Court Properly Excluded Evidence of K.B.'s Collateral Sexual Conduct.

Montgomery next contends that the trial court erroneously excluded several pieces of evidence and that by so doing it usurped his right to present a defense. His defense, essentially, was that K.B. had falsely accused him of sex crimes because she resented his discipline and wished to remove him from the family. In addition to an attack upon various inconsistencies within and among K.B.'s different accounts of the alleged incidents in her statements to police officers and to the prosecutor, this defense involved several lines of proof. One such line was that K.B. had a history of making false accusations against Montgomery, with the implication that the current accusations were false as well. Another line of proof was that K.B. was a wild, sexually precocious child which Montgomery argued was relevant to two aspects of his defense: first that she resented his attempts to discipline and control her and thus had a motive to have him out of her life; and second that, despite her youth, she had the knowledge and lack of compunction necessary to make credible, albeit false, allegations of sexual misbehavior. Yet another line of proof was that K.B. had in the past and was again using false allegations against Montgomery to deflect allegations of wrong doing against herself. Although Montgomery was permitted to introduce some evidence along each of these lines of proof, the trial court excluded some evidence pertinent to each line as well. Montgomery maintains that the exclusions were erroneous under the rules of evidence and denied him his constitutional right to present a meaningful defense. We consider each line of proof in turn, beginning with Montgomery's attempt to show that K.B. had accused him falsely in the past.

### A. Even If Erroneous, The Exclusion Of A Doctor's Opinion That K.B. Was A Virgin in 2002 Was Rendered Harmless When The Opinion Was Actually Presented To The Jury for Consideration.

At trial, Montgomery was permitted to offer proof and to argue that in 2002, in November 2004, and again in May 2005, K.B. had accused him of "raping" and/or molesting her but that soon afterward, on all three occasions, she had recanted her allegations. K.B. testified at trial that the 2002 incident had actually involved fondling, not intercourse, but that at the time, being only eleven years old, she had believed that the improper touching was "rape." Hence, she had accused Montgomery of rape, but later recanted. Montgomery was also permitted to offer proof and to argue that in early December 2004, after the mother of one of K.B.'s

Indiana classmates reported rumors of abuse, K.B. denied that any abuse had occurred.

As part of his proof that the 2002 allegation was false, Montgomery sought to introduce the deposition of the emergency room physician who had examined K.B. in the wake of that allegation, which apparently was not reported until three or four months after the alleged incident. In addition to his testimony that K.B.'s exam had been normal with no visible damage to her hymen, the physician testified that in his opinion the normal exam was inconsistent with K.B.'s claim of rape and indicated that at the time K.B. was still a virgin. The trial court permitted the introduction of the physician's factual observations, but ordered that, his opinions be redacted from the deposition testimony. Montgomery argues that the physician was competent to offer the opinion that K.B. had never been sexually penetrated and that the trial court's contrary ruling rendered his trial unfair.

We need not address the first contention (although we note that we have upheld testimony by gynecological experts to the effect that a "normal" exam following an alleged rape, particularly an exam months after the alleged rape, is not inconsistent with the allegation, *see, e.g., Collins v. Commonwealth*, 951 S.W.2d 569 (Ky.1997); *Garrett v. Commonwealth*, 48 S.W.3d 6 (Ky.2001)), because even if the trial court erred by deeming a non-gynecologist's opinions in this area inadmissible, there is no possibility in this case that the error had a substantial effect on the outcome. Indeed, the court's ruling on the testimony was not actually implemented and, in any event, K.B. herself acknowledged that she was not raped by Montgomery in 2002. Thus, any error in the handling of this issue was harmless. *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky.2009)

(noting that a non-constitutional error may be deemed harmless "if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error").

While the emergency room physician was prevented from opining that K.B. was a virgin in 2002, he was allowed, perhaps through inadvertence, to testify that in his opinion a penis had never penetrated K.B.'s vagina. Notwithstanding the court's decision to exclude such statements from the physician's deposition, that statement was not redacted, it was read to the jury, and it figured prominently in the closing argument by Montgomery's counsel. Montgomery thus had the benefit of the physician's opinion despite the court's ruling, and the exclusion of other statements by the physician to the same or similar effect could not have substantially swayed the jury's decision. Furthermore, K.B. herself conceded during her trial testimony that she had not been raped in 2002. Given the evidence the jury actually heard, both from the physician and K.B., the court's pretrial ruling on the physician's testimony, however erroneous, was harmless. *Winstead, supra.*

**B. The Trial Court Did Not Err By Excluding Evidence of K.B.'s Collateral Sexual Conduct Allegedly Offered to Show K.B.'s Sexual Knowledge and Motives to Accuse Montgomery.**

In addition to proof tending to show that K.B.'s allegations were false, Montgomery also sought to show that K.B. had both a motive and the ability to make false sexual accusations. He argued, for example, that similar allegations brought on behalf of her older sister against K.B.'s biological father and that sister's own allegations against Montgomery (about which the sister testified at trial) taught K.B. the power such accusations could have. He testified, moreover, that he had tried to introduce

discipline into the home and to limit when and where K.B. could see her boyfriend. Montgomery maintained that K.B.'s resentment of those restraints made her want to get rid of him and prompted her allegations.

Additionally, Montgomery sought to testify and/or to cross-examine K.B. concerning a sexually explicit note K.B. passed at school, a sexually explicit website K.B. allegedly maintained on *myspace.com,* and sexual aggression K.B. allegedly exhibited toward her brother's friends, all of which tended, he claimed, to show that K.B., despite her youth, had sufficient sexual knowledge to fabricate the charges against him. Montgomery also sought to testify and to cross-examine K.B. concerning statements she allegedly had made to Montgomery proclaiming that she had had sex with her older brother. His objection to that relationship, he asserts, is what prompted the final altercation in May 2005 and the ensuing allegations of rape.

■ The trial court disallowed all of this evidence concerning K.B.'s alleged collateral sexual activity as violative of KRE 412, the so-called rape shield rule. Under that rule, in cases involving alleged sexual misconduct, evidence is generally not allowed which is offered to prove that an alleged victim engaged in other sexual behavior or to prove an alleged victim's sexual predisposition. The rule is meant both to shield the victims of sex crimes from painful and embarrassing questions and disclosures about their private sexual activities as well as to preserve the fairness of the proceedings by excluding irrelevant attacks on the victim's character and guarding against distracting the jury with collateral matters.

### 1. KRE 412 Applies to Minors as Well as Adults.

■ Montgomery first argues that the rule does not apply to K.B. because as a minor she is presumed not to have consented to sexual activity. He posits that, being underage and incapable of consent, she cannot be prejudiced by evidence that she engaged in other sexual behavior or even evidence that she was sexually predisposed. Montgomery construes the purpose of the rule too narrowly. It is not meant only to preclude evidence of "consensual" sexual activity, but, as noted, it is also meant to protect victims from unduly harassing cross-examination and to eliminate from trials immaterial evidence about the victim's character. Minors no less than adults can find questions about their sexual activities humiliating and offensive, and, whatever the law's technical rules about consent, evidence about a minor's character and collateral sexual activity is no less subject to misuse by the jury than is similar evidence about an adult. *See People v. Parks,* 483 Mich. 1040, 766 N.W.2d 650 (2009) (collecting cases demonstrating that the vast majority of states to have considered the issue have held that their rape shield laws apply to involuntary as well as voluntary sexual conduct). We therefore reject Montgomery's contention that KRE 412 does not apply to minors.

### 2. KRE 412(b)(1)(C) Is the Only Exception Potentially Relevant Here.

KRE 412 clearly applies here but the "shield" is not always absolute. The rule itself recognizes three exceptions. Evidence of the victim's past sexual experience with others is admissible if offered not as proof of character but "to prove that a person other than the accused was the source of semen, injury, or other physical evidence." KRE 412(b)(1)(A). Evidence offered by the defense of the victim's past sexual experience with the accused is admissible "to prove consent." KRE

412(b)(1)(B). And, in general, evidence of the victim's past sexual behavior is admissible if it "directly pertain[s] to the offense charged." KRE 412(b)(1)(C). The rule's drafters noted that this third exception was included only as a safety valve to allow for unanticipated circumstances in which evidence of a victim's prior sexual conduct would be appropriate. They cautioned, however, that it should be invoked "carefully and sparingly," so as not to undermine the rule's objective "of protecting against: unwarranted attacks on the character of the alleged victim." Robert G. Lawson, *Kentucky Evidence Law Handbook*, p. 166 (4th Ed. 2003) (citing and quoting from Evidence Rules Study Committee, Kentucky Rules of Evidence—Final Draft, p. 36 (Nov. 1989)).

The Commonwealth did not rely in this case on semen, injury, or other physical evidence to substantiate K.B.'s allegations, and Montgomery did not defend or seek to defend on the basis of consent. The first two exceptions in KRE 412(b)(1)(A) and (1)(B) therefore do not apply, and we are left with exception (1)(C), the residual exception for evidence "directly pertaining to the offense charged." The trial court construed this exception narrowly and ruled that K.B.'s alleged note to school friends and myspace website, and her alleged behavior with her brother and toward his friends all pertained only to K.B.'s character, not directly to the charged offenses, and thus were not admissible under exception(1)(C). Montgomery contends that the trial court read the exception too narrowly, apparently construing "directly pertaining to the offense charged" to require that the prior sexual behavior have a direct connection with the behavior allegedly constituting the offense. He maintains that prior sexual behavior pertains directly to the charged offense if it bears materially on any aspect of his defense.

### 3. A Defendant's Constitutional Rights Must be Balanced Against Legitimate State Interests Protected in Evidentiary Rules.

In so contending, Montgomery correctly points out that KRE 412 must be construed, as must all the rules of evidence, in a manner that does not contravene his constitutional rights. He correctly notes that in several cases the United States Supreme Court has held that a defendant's constitutional right to present a meaningful defense trumped an evidentiary rule. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (rules precluding hearsay and impeachment of one's own witness, invoked to exclude three out-of-court admissions by a witness that he, and not the defendant, had committed the murder); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (rule protecting the confidentiality of juvenile offense records, invoked to exclude the fact that key prosecution witness may have been biased in favor of the prosecution because he was on juvenile probation); *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (rule excluding evidence more prejudicial than probative, invoked to exclude the fact that in exchange for his cooperation a prosecution witness in a murder case had had a criminal charge dismissed); *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (although not specified, apparently the rule excluding irrelevant testimony, implicitly invoked to exclude defendant's testimony describing the physical and psychological circumstances in which his confession was obtained); *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (per se rule excluding all hypnotically refreshed testimony, invoked to exclude crucial portions of manslaughter defendant's own testimony regarding defective

gun misfiring); *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (rule excluding evidence more prejudicial than probative, invoked to exclude the fact that prosecuting witness in a rape case was in an interracial relationship where defendant wished to argue that protecting that relationship gave the witness a motive to fabricate her rape allegations); *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (rule limiting a defendant's ability to introduce evidence of a third-party perpetrator where there is strong forensic evidence of defendant's guilt, invoked to exclude evidence of a third-party who could have committed crimes).

 As these cases establish, Montgomery has a right under the federal Constitution (and the Kentucky Constitution as well) to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. at 690, 106 S.Ct. 2142 (*quoting from California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *Beaty v. Commonwealth*, 125 S.W.3d 196 (Ky.2003). That right, grounded in the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section 11 of the Kentucky Constitution, includes, of course, Montgomery's right to testify on his own behalf, *Rock v. Arkansas, supra,* and his right to cross-examine the witnesses against him. *Davis v. Alaska, supra.* Indeed, "an accused's right to present his own version of events in his own words," the United States Supreme Court has explained, is "[e]ven more fundamental to a personal defense than the right of self-representation." *Rock,* 483 U.S. at 52, 107 S.Ct. 2704. The Supreme Court has recognized, moreover, that "a proper and important function of the constitutionally protected right of cross-examination" is "the exposure of a witness' motivation in testifying."

*Delaware v. Van Arsdall,* 475 U.S. at 678–79, 106 S.Ct. 1431 (citation and internal quotation marks omitted). These rights must be balanced, however, against both the wide latitude trial judges retain "to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," *id.* at 679, 106 S.Ct. 1431, and the broad latitude state rule makers have "to establish rules excluding evidence from criminal trials." *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

In *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the Supreme Court addressed the need to balance these competing concerns in the context of a rape shield law. The Court reversed a decision by the Michigan Court of Appeals holding that the notice requirement in Michigan's rape shield law violated, per se, the Sixth Amendment in all cases where it was used to preclude evidence of past sexual conduct between a rape victim and a criminal defendant. Noting that the Michigan statute "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy," *id.* at 150, 111 S.Ct. 1743, the Court asserted that the Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 149, 111 S.Ct. 1743 (*quoting from Rock,* 483 U.S. at 55, 107 S.Ct. 2704). In upholding the rape shield law's notice provision, the Court emphasized that any restrictions on a criminal defendant's right to confront witnesses and to present relevant evidence, " 'may not be arbitrary or disproportionate to the purposes they are designed to serve.' " *Id.* at 151, 111 S.Ct.

1743 (*quoting from Rock*, 483 U.S. at 56, 107 S.Ct. 2704).

In the wake of *Lucas* and *Rock*, numerous courts have held that with those cases the Supreme Court established a balancing test for evaluating, on a case-by-case basis, Confrontation Clause and other Sixth Amendment challenges premised upon the exclusion of evidence. Under that test, courts must "determine whether the rule relied upon for the exclusion of evidence is 'arbitrary or disproportionate' to the 'State's legitimate interests.'" *Barbe v. McBride*, 521 F.3d 443, 457 (4th Cir.2008) (*quoting from Quinn v. Haynes*, 234 F.3d 837, 849 (4th Cir.2000) and discussing what the Fourth Circuit has referred to as the "*Rock–Lucas* principle"). *See also, e.g., United States v. Pumpkin Seed*, 572 F.3d 552 (8th Cir.2009); *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir.2007); *White v. Coplan*, 399 F.3d 18 (1st Cir.2005); *LaJoie v. Thompson*, 217 F.3d 663 (9th Cir.2000). The Supreme Court itself has applied this standard in *Holmes v. South Carolina, supra* and *United States v. Scheffer, supra*.

■ An evidentiary exclusion is not arbitrary if it meaningfully furthers a valid purpose the rule was meant to serve. *Holmes, supra; United States v. Pumpkin Seed, supra*. In determining whether the exclusion is disproportionate, courts have weighed "the importance of the evidence to an effective defense, [and] the scope of the ban involved" *White v. Coplan*, 399 F.3d at 24 (*citing Davis* and *Van Arsdall*), against any prejudicial effects the rule was designed to guard against. *Barbe, supra; LaJoie, supra*. Exclusions have been found invalid where the probative value of the excluded evidence was substantial, *White; Barbe,* and where the trial court failed to consider its probative value, *Holmes,* but they have been upheld where the probative value of the excluded evi-

dence was deemed slight, *Pumpkin Seed; Quinn. Cf. Van Arsdall* at 680, 106 S.Ct. 1431 (holding that a defendant states a violation of the Confrontation Clause where "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination.").

## 4. The Trial Court's Rulings Reflect a Proper Balancing of The Competing Interests.

■ With this constitutional background in mind, we turn again to KRE 412. Although we have not often had occasion to consider the application of KRE 412(b)(1)(C), the residual exception to the rule, in the few cases we have considered we have adopted an approach much like and completely consistent with the balancing of interests required under the federal constitution. In *Barnett v. Commonwealth*, 828 S.W.2d 361 (Ky.1992), for example, we construed a virtually identical provision in KRE 412's predecessor statute, and held that in the face of medical evidence establishing that the young victim had been sexually active, evidence of the victim's sexual contact with her brother was crucial to the defense and should have been admitted as "directly pertaining" to the charged offense. Similarly, in *Anderson v. Commonwealth*, 63 S.W.3d 135 (Ky.2001), we again held that evidence of the child victim's prior sexual activity "directly pertained" to the charges inasmuch as it provided the defense's only means of countering medical evidence showing that the victim had been sexually active. In *Woodard v. Commonwealth*, 219 S.W.3d 723 (Ky.2007), *Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky.1997), and *Violett v. Commonwealth*, 907 S.W.2d 773 (Ky.1995), on the other hand, we held, respectively, that marginally probative col-

lateral evidence concerning the victim's prior sexual activity, evidence of the victim's remote and doubtfully relevant prior acts, and cumulative evidence of the victim's alleged conspiracy with her boyfriend to "get the defendant out of the way" did not outweigh the purposes of the rule and so did not "pertain directly" to the charged offenses. We add little to this precedent by holding now that evidence of a sexual offense victim's prior sexual behavior pertains directly to the charged offense and thus is admissible under the KRE 412(b)(1)(C) residual exception if, and only if, exclusion of the evidence would be arbitrary or disproportionate with respect to KRE 412's purposes of protecting the victim's privacy and eliminating unduly prejudicial character evidence from the trial.

 In this case, Montgomery sought to introduce evidence that K.B. had passed a sexually explicit note at school, that she had posted sexually explicit material on the internet, that she had behaved in a sexually suggestive manner toward her brother's friends, and that she had made statements about having had sex with her brother. Montgomery first argues that this evidence was probative of K.B.'s sexual knowledge and was necessary to counter the jury's likely presumption that she would not have known about intercourse or about male ejaculation unless Montgomery had in fact abused her. As Montgomery notes, several courts have ruled evidence of a young victim's prior sexual experience admissible on this alternative-source-of-knowledge ground. *See State v. Budis,* 125 N.J. 519, 593 A.2d 784 (1991) (collecting cases); *State v. Jacques,* 558 A.2d 706 (Me.1989). In most of those cases, however, the victim was very young at the time he or she made the allegations, generally under eleven; the victim had had a well-documented prior experience; and the details of the prior experi-

ence were strikingly like the details of the alleged offense. Here, while K.B. conceded at trial that in 2002 when she first accused Montgomery of "rape" she did not even know what the term meant, by May 2005, when she first made her more detailed allegations in this case, she was fourteen years old, old enough in our sexually saturated culture to have acquired a great deal of sexual knowledge. K.B.'s jury was thus not likely to presume, as in the case of younger victims, that K.B.'s knowledge must have derived from experience. The evidence Montgomery sought to introduce, moreover, does not clearly establish a similar prior incident, one the details of which could account for some particularly striking detail in her accusations against Montgomery. In terms of sexual detail, indeed, K.B.'s accusations were fairly generic, the sort of detail a teenager might know, and thus the excluded circumstantial evidence, no striking details of which have been brought to our attention, would have added little, if anything, to the jury's understanding of K.B.'s knowledge. On the other hand, the excluded evidence posed a substantial threat of casting K.B.'s character in a bad light and distracting the jury from the real issues in the case, the principal evils which KRE 412's shield is intended to avoid. With respect to K.B.'s knowledge, therefore, the exclusion of the evidence was neither arbitrary nor disproportionate, and on that ground, accordingly, the trial court did not abuse its discretion under KRE 412 or deprive Montgomery of any constitutional right.

Montgomery also contends that the excluded evidence was probative of K.B.'s motive to fabricate her allegations. The argument is that K.B. resented Montgomery's discipline, resented his curtailing of her sexual activities in particular, and, specifically, that his objecting to what he suspected was a sexual relationship between

K.B. and her brother precipitated the May 26, 2005 uproar that culminated in K.B.'s allegations. Montgomery insists those allegations were intended to remove him from the household. As Montgomery correctly notes, substantially probative evidence that a sex offense victim has a motive to fabricate charges has received strong constitutional protection even in the face of legitimate countervailing interests. *Olden v. Kentucky, supra; White v. Coplan, supra; United States v. Platero*, 72 F.3d 806 (10th Cir.1995) (*citing Olden* ). The evidence must be substantially probative, however. The exclusion of speculative or merely cumulative evidence is not rendered arbitrary or disproportionate merely because the word "motive" has been invoked. In *Violett v. Commonwealth, supra*, for example, a case very similar to this one, a stepfather accused of sexually abusing his stepdaughter sought to introduce her letters describing sexual activity with her boyfriend so as to bolster his defense that the two young people fabricated the abuse allegations in order to get rid of him. This Court held that the trial court had not abused its discretion under KRE 412 by excluding the letters and any other reference to the stepdaughter's sexual activity. The defendant had been given ample opportunity otherwise to develop his conspiracy theory, we noted, and thus the sexual-activity evidence was merely cumulative.

In this case, too, Montgomery was permitted to develop his "resentment of discipline" defense by testifying and by questioning K.B. about instances when he had denied K.B. some privilege, ordered a boyfriend to go home, forbade K.B. from seeing certain friends, or ordered K.B. to stay in the house and she, allegedly, had rebelled. Montgomery was also permitted to testify that the May 26th uproar arose when he objected to K.B.'s brother's presence in the family because K.B. and the

brother were "too close." K.B.'s note to school friends, her alleged internet postings, her alleged aggression toward her brother's friends, and the alleged relationship between K.B. and her brother were thus no less cumulative than the daughter's alleged sexual relationship in *Violett* and were even more apt to cast K.B.'s character in a bad light.

Finally, we are compelled to note that Montgomery's suspicions about K.B. and her brother appear to have been merely that, suspicions. Montgomery has referred us to nothing in the record which might lend credence to them. In the absence of any facts giving probative value to those suspicions, they were properly excluded under KRE 412 as merely speculative. *Davenport v. Commonwealth*, 177 S.W.3d 763 (Ky.2005) (not erroneous to exclude evidence of merely speculative defense theories).

In sum, the exclusion of evidence of K.B.'s alleged sexual boasting in a school note and myspace page, her alleged aggression toward her brother's friends, and her alleged relationship with her brother under KRE 412 was neither arbitrary nor disproportionate to the legitimate interests protected by the rule. The trial judge's rulings comported fully with the balancing test to be applied in the wake of *Lucas* and *Rock* when defendants seek to offer evidence marginally relevant to a defense but contrary to important interests addressed in state evidentiary rules.

## C. The Trial Court Did Not Err By Excluding Evidence That Abuse Allegations Had Been Made Against K.B.

Montgomery also pursued a third line of proof, which, like the second, was meant to show that K.B. had a motive to make false accusations. He was allowed to introduce the fact that in May 2005, when the family had its final blowup and K.B.

made the allegations that led to his indictment, K.B. was on probation for a burglary offense. He argued that K.B. made the allegations against him in hopes of somehow diverting attention from her own legal problems, and, indeed, there was police testimony to the effect that when K.B. recanted her allegations a few days after making them, she said that when she made the allegations protecting her probation had been on her mind. As noted above, K.B.'s recantation put a halt to any investigation of her allegations until August 2005, when she recanted her recantation, as it were, and renewed the allegations which then led to Montgomery's indictment.

Montgomery sought to introduce evidence showing that a few days prior to K.B.'s renewed allegations in August, two of Montgomery's relatives had complained to Indiana authorities that K.B. had sexually abused their young children. It was during questioning in Indiana about those allegations against her that K.B. renewed her prior allegations against Montgomery. Montgomery sought to introduce the complaints of abuse against K.B. in order to argue that she had again accused him falsely in order to divert attention from herself and her own issues. The trial court disallowed any evidence of K.B.'s alleged abuse of others, however, as violative of KRE 412. Montgomery again argues that the trial court erred by applying KRE 412 in a way that deprived him of vital defense evidence. We disagree.

Again, only the residual exception to KRE 412 is potentially applicable to the evidence of K.B.'s alleged abuse of others, and we agree with the trial court that evidence of that alleged abuse of Montgomery's young relatives did not "directly pertain" to the charges against Montgomery. Moreover, balancing Montgomery's right to present a defense against legitimate interests reflected in KRE 412 as

discussed above, the exclusion of that evidence was neither arbitrary under the rule nor disproportionate to the rule's purposes. The exclusion plainly served to shield K.B. from an attack upon her character, and it also served to prevent what was virtually certain to become a highly confusing and time consuming trial-within-the-trial regarding the validity of the allegations against K.B., a matter distinctly collateral to the issues properly before the jury. Against those very real concerns, the probative value of the evidence of allegations made by Montgomery's Indiana relatives was slight. Although K.B.'s interview regarding the Indiana allegations provided an *occasion* for the renewal of her allegations against Montgomery, it provided only weak evidence of a *motive* for that renewal. The occasion was adequately explained to the jury when the Indiana investigator testified that he called K.B. in on "another matter" and that when he finished talking to her about that matter asked her again about the 2004 allegations against Montgomery.

In addition, with respect to K.B.'s alleged motive, Montgomery does not argue, and there is no suggestion in the record, that this is a case like *Davis, supra,* and like *Van Arsdall, supra,* in which there is the possibility that the prosecuting witness cooperated with the police in exchange for leniency or to protect her probationary status. Nor is this a case, like *Davis,* in which K.B. might have accused Montgomery of a crime in order to deflect suspicion from herself for that very same crime. Instead, Montgomery argues that K.B. hoped to divert attention from her alleged abuse of others by accusing him of different abuse. There is very little logic, and thus very little force, to that argument. As far as diverting suspicion is concerned, K.B. would have scant motive to accuse Montgomery of abusing her, since that accusation would have no bearing on dif-

ferent allegations in which she was the alleged abuser. In short, the evidence of K.B.'s alleged abuse of Montgomery's young relatives had questionable probative value and, given its highly prejudicial potential, its exclusion did not amount to a disproportionate application of KRE 412.

**D. The Trial Court Properly Applied KRE 412, the Specifically Applicable Evidentiary Rule, As Opposed to the General Provisions of KRE 404(b).**

Finally, Montgomery argues that notwithstanding KRE 412, the evidence of K.B.'s prior and collateral sexual behavior should have been admitted under KRE 404(b) as so called reverse 404(b) evidence. This reverse evidence would tend not to inculpate but rather to exculpate Montgomery by proving K.B.'s motive for making false allegations as opposed to proving K.B.'s character generally, an impermissible use. As noted above, KRE 404(b) is a very general rule excluding much character evidence, but providing that evidence of "other crimes, wrongs, or acts," may be admissible if offered for some purpose other than to prove character and action in conformity therewith such as "proof of motive...."

It is a commonplace principle of statutory construction, however, that where statutory provisions overlap the provision that deals more specifically with the matter at issue controls. *Light v. City of Louisville*, 248 S.W.3d 559 (Ky.2008). Here, clearly, KRE 412 addresses the evidence of K.B.'s alleged sexual behavior more specifically than do the general provisions of KRE 404(b). By its own terms, moreover, KRE 404(a)(2) provides that an accused cannot introduce character evidence regarding the victim of criminal sex-

ual conduct. This language is generally viewed as a reference to KRE 412, thus subordinating KRE 404 to that rule. Underwood and Weissenberger, *Kentucky Evidence Courtroom Manual* 125 (2009–2010 Ed.). Accordingly the trial court correctly looked to KRE 412 in assessing the admissibility of evidence regarding K.B.'s alleged collateral sexual conduct.

**IV. Montgomery's Alleged Errors in the Penalty Phase of His Trial Do Not Entitle Him to Relief.**

Montgomery next complains that he was improperly sentenced. He contends first that the trial court unfairly and improperly continued the penalty phase of the trial to allow the Commonwealth to perfect its proof of Montgomery's prior felony convictions in Indiana, proof necessary to establish Montgomery's persistent felon status. Montgomery also argues the certified proof of his prior felonies was admitted without a proper foundation. Finally, Montgomery contends palpable error occurred when the jury returned a first-degree persistent felon sentence without having also recommended an unenhanced sentence for his underlying sexual abuse offense. We disagree with all three contentions.

**A. The Trial Court Did Not Abuse Its Discretion By Granting The Commonwealth A Brief Continuance Within Which To Perfect Its Proof Of Montgomery's PFO Status.**

The jury convicted Montgomery of sexual abuse late on a Thursday night. The court reconvened the next morning to address Montgomery's sentencing. The Commonwealth alleged that Montgomery had been convicted of at least two prior felony offenses [2] and thus was subject to

---

2. The Commonwealth eventually introduced evidence of five prior felony offenses on the persistent felony offender charge.

enhanced sentencing as a persistent felony offender (PFO) under KRS 532.080. Before the opening of the penalty phase, Montgomery moved, in essence, to have the PFO charge dismissed because the proof the Commonwealth had proffered of his prior convictions—records of Indiana felony judgments—had not been certified by an Indiana judge as required by KRS 422.040. That statute provides in part that the judgment of another state shall be given full faith and credit in Kentucky if it is attested by the clerk of the foreign court "and certified by the judge, chief justice, or presiding magistrate of th[at] court." The records of the Indiana judgments the Commonwealth proposed to rely upon had been attested by an appropriate clerk, but they had not been certified by an appropriate judge. Montgomery argued that without the judicial certifications the judgments were inadmissible and that without the judgments the Commonwealth could not meet its burden of proving his PFO status. The court acknowledged that Montgomery had raised a valid concern about the competency of the records, but rather than dismiss the PFO charge the court continued Montgomery's penalty phase from that day, Friday, until the following Wednesday to allow the Commonwealth an opportunity to perfect its proof. The Commonwealth obtained the required certifications, and, as noted above, when Montgomery's sentencing was resumed the jury found him to be a first-degree persistent felon. Montgomery now contends that the continuance of the penalty phase of his trial to allow the Commonwealth to shore up its proof rendered the trial proceedings fundamentally unfair. We disagree.

 As Montgomery concedes, the granting of a continuance is in the sound discretion of the trial court and will not provide grounds for relief absent an abuse

of that discretion. *Eldred v. Commonwealth,* 906 S.W.2d 694 (Ky.1994). Among the factors bearing on the court's decision are the length of the delay; the inconvenience apt to be imposed on parties, witnesses, jury, counsel, and court; whether the delay is purposeful or otherwise caused by the party desiring the continuance; and whether the opposing party would suffer any undue prejudice. *Id.* at 699 (*citing Snodgrass v. Commonwealth,* 814 S.W.2d 579 (Ky.1991)).

Here, the three day continuance was not significantly inconvenient, but Montgomery maintains that it was caused by the Commonwealth's lack of diligence in marshalling its evidence and was unduly prejudicial in that it denied him the windfall of what he insists would and should have been a PFO acquittal. The Commonwealth's fault was not a lack of diligence, however. It timely obtained sufficient proof of Montgomery's PFO status but erred in determining precisely how to authenticate the out-of-state proof. As the trial court correctly observed, the issue raised was not about the sufficiency of the Commonwealth's evidence but rather its competency.

In *Merriweather v. Commonwealth,* 99 S.W.3d 448 (Ky.2003), a case in which the defendant had been deemed a PFO on the basis of uncertified prior judgments, we held that the uncertified records were incompetent and required that the PFO finding be reversed. We further held that the remedy was not the dismissal of the PFO allegation, for which sufficient albeit incompetent evidence had been introduced, but instead a remand for a new sentencing at which time the Commonwealth would have an opportunity to correct the initial flaw.

Under *Merriweather,* then, the trial court here could have admitted the Commonwealth's questionable proof with the

possibility, in the event of a PFO finding, that the case would eventually be remanded for the Commonwealth to perfect its proof, or the court could, as it did, grant at the outset the relief *Merriweather* declares is appropriate and require the Commonwealth to perfect its sufficient but flawed PFO proof if it could. This is all the relief to which Montgomery was entitled, and he was not unduly prejudiced by being denied more. Although the Commonwealth's lapse would not have occurred had the rule and statute been carefully read, the mistake was not an egregious one, and the trial court neither abused its discretion nor denied Montgomery a fair penalty phase by giving the Commonwealth a reasonable opportunity to correct it.

**B. The Trial Court Did Not Err By Admitting Duly Certified Records Of Prior Judgments Without Additional Authentication.**

■ The duly certified copies of the Indiana records were introduced at Montgomery's sentencing through the testimony of a Kentucky probation and parole official, who, without claiming any prior knowledge of them, read from the records the facts pertinent to the PFO charge. Montgomery next contends that even having certified its copies of the Indiana records, the Commonwealth still failed to authenticate them by means of a witness from the Indiana agency that created them, a witness who could testify that the records were what they purported to be.

As the parties note, our Court of Appeals addressed this issue at some length in *Skimmerhorn v. Commonwealth*, 998 S.W.2d 771 (Ky.App.1998). That Court correctly observed that under KRE 1005 the contents of official federal, state, county, or municipal records "may be proved by copy, certified as correct in accordance with KRE 902 *or* testified to be correct by a witness who has compared it with the

original." (emphasis supplied). Either method of authentication suffices under the rule, and accordingly the Court of Appeals held, correctly, that the pertinent contents of a prior judgment could be introduced in a PFO proceeding by means of a copy of the judgment, duly certified in accordance with KRE 902 (and with KRS 422.040 we would add), even without the testimony of the record's custodian or anyone else familiar with it. Montgomery does not dispute that ultimately the copies of his Indiana judgments were properly certified in accordance with the applicable statutes and rules. The trial court did not err, therefore, when it permitted the contents of those records to be introduced through a Kentucky probation and parole officer.

Against this conclusion Montgomery relies on several cases—*Merriweather v. Commonwealth, supra; Robinson v. Commonwealth*, 926 S.W.2d 853 (Ky.1996); *Hall v. Commonwealth*, 817 S.W.2d 228 (Ky.1991); *Commonwealth v. Willis*, 719 S.W.2d 440 (Ky.1986); and *Hobbs v. Commonwealth*, 655 S.W.2d 472 (Ky.1983)—all of which imply, he maintains, that both certification and custodian testimony are required to authenticate, for PFO purposes, the record of a prior conviction. His reliance on these cases is misplaced. As pertinent here, these cases all hold or acknowledge that a copy of the prior judgment itself (not the mere reflection of that judgment in some other agency's records) is necessary to prove a prior conviction. None of these cases, however, addresses how the record of the prior judgment is to be authenticated, although in *Robinson* we refer to "exemplification" under KRS 422.040 and "a witness who can testify" concerning the record's authenticity as alternative methods of establishing the admissibility of court data. *Id.* at 854. These, of course, are the alternatives ex-

pressly provided for under KRE 1005, which applies to records of conviction no less than to other official records. None of the cases Montgomery has referred us to imply, much less hold, anything to the contrary.

**C. The Trial Court's Failure To Instruct The Jury To Impose An Underlying Sentence For The Primary Offense Before Imposing An Enhanced PFO Sentence Did Not Amount To A Palpable Error.**

 Following the introduction of penalty phase evidence, the jury was instructed to decide whether Montgomery was a persistent felon and if so to fix his sentence at between ten and twenty years. If the jury determined that persistent felon status had not been established, it was instructed to sentence Montgomery on the underlying sexual abuse offense to between one and five years. Montgomery did not object to these instructions. In accord with them, the jury found that Montgomery was a persistent felon and, without fixing a sentence for the underlying offense, sentenced him to twenty years' imprisonment as a PFO.[3] Montgomery now contends that the instructions should have required the jury to fix an underlying sentence first before recommending any PFO sentence. This latter procedure is the one approved in *Commonwealth v. Reneer*, 734 S.W.2d 794 (Ky.1987) and is arguably required under KRS 532.080(1), which provides that the PFO sentence shall be fixed "in lieu of the sentence of imprisonment assessed ... for the crime of which [the defendant] presently stands convicted."[4] Montgomery concedes that

this issue is not preserved, but seeks review for palpable error under RCr 10.26. That question, however, has already been decided against him.

In *Montgomery v. Commonwealth*, 819 S.W.2d 713 (Ky.1991), we held that where, as here, there is no possibility that the PFO sentence is unlawful, any error in not requiring the jury to fix an underlying sentence was a mere procedural defect not subject to review in the absence of a contemporaneous objection. Although in *Montgomery* we did not expressly review the allegedly faulty sentencing procedure for palpable error, we clearly indicated that absent some possibility of an illegal sentence, any mere procedural error did not result in a manifest injustice. We expressly so hold today, and conclude that the jury's not having fixed an underlying sentence does not entitle Montgomery to palpable error relief. *Commonwealth v. Jones, supra*, (noting that palpable error relief is not available unless the error resulted in a manifest injustice).

### CONCLUSION

In sum, Montgomery is not entitled to relief with respect to either his conviction or his sentence. Although Montgomery's trial included evidence of collateral acts of sexual abuse against third parties, evidence that arguably required the severing of the rape and abuse charges against him, the joint trial was not prejudicial because Montgomery was acquitted of the rape charges and the collateral act evidence was admissible with respect to the abuse charge. Nor was Montgomery's trial marred by the exclusion of defense evi-

---

3. Although the jury did not fix an underlying sentence, the trial court did. Montgomery's final judgment imposes a five year sentence for the offense of first-degree sexual abuse. The propriety of this has not been raised nor is it germane to our disposition of this issue.

4. This *Reneer* procedure is highly preferable because in those cases where the only reversible error relates to the PFO charge, there is a sentence on the underlying charge, limiting the necessary proceedings on remand.

dence. His expert's opinion regarding K.B.'s virginity was introduced despite the trial court's contrary ruling, and otherwise the evidence of K.B.'s prior sexual conduct was properly excluded under KRE 412. The exclusion did not violate Montgomery's right to present a meaningful defense. Nor, finally, was Montgomery improperly sentenced. The trial court did not. abuse its discretion by giving the Commonwealth a brief continuance to further certify its PFO proof; the certified proof was properly admitted without additional authentication by a record custodian; and the trial court's failure to have the jury recommend a sentence for Montgomery's underlying sexual abuse offense did not render Montgomery's PFO sentence manifestly unjust. Accordingly, we affirm the October 8, 2007 Judgment of the Trimble Circuit Court.

MINTON, C.J.; CUNNINGHAM, SCHRODER, SCOTT, and VENTERS, JJ., concur. NOBLE, J., concurs in result only.